William R. REDDICK, Jr., and Phillips, Brandt, Reddick and Associates, Inc., a Colorado corporation, Plaintiffs-Appellants,

v.

Roy CRAIG and The Durango Herald, Inc., Defendants-Appellees.

No. 83CA1372.

Colorado Court of Appeals, Div. III.

Dec. 12, 1985.

Rehearing Denied Jan. 16, 1986.

Certiorari Denied (Reddick) May 5, 1986.

Bader & Cox, Gerald L. Bader, Jr., Jeffrey M. Villanueva and Martha M. Ezzard, Denver, for plaintiffs-appellants.

Rector, Retherford, Mullen & Johnson, Anthony A. Johnson and Neil C. Bruce, Colorado Springs, for defendant-appellee Roy Craig.

Yates & Crane, Russell E. Yates and Alan G. Hill, Durango, for defendant-appellee The Durango Herald, Inc.

BABCOCK, Judge.

In this libel action, plaintiffs, William R. Reddick, Jr., (Reddick) and Phillips, Brandt, Reddick and Associates, Incorporated (PBR), appeal from the trial court's entry of summary judgment in favor of defendants, Roy Craig (Craig) and the Durango Herald, Inc. (Herald). We affirm.

Reddick is the chief operating officer and the major stockholder of PBR. PBR, which engages in land use planning, was employed by La Plata County in July 1977 to develop a comprehensive land-use plan for the county over a three year period. During this time a public dispute developed concerning land use planning and expenditures therefor. Reddick organized and conducted nineteen public meetings to inform the public of the planning process. Public meetings were also held by the La Plata County Planning Commission, the Durango City Council, and the La Plata County commissioners. Reddick and Craig attended many of these meetings, which were given extensive media coverage.

Craig, a technical and environmental consultant from La Boca, was chairman of the La Plata County Landowners Association which had filed a civil action alleging that the La Plata County commissioners had violated the Local Government Budget Law of Colorado. He, along with others, also obtained the appointment of a special prosecutor to investigate allegations contained in the civil complaint. During 1979 and 1980 Craig wrote a number of letters to the Herald concerning land use planning. The two letters published by the Herald on December 13, 1979, and March 11, 1980, which are the subject of this action, are appended hereto as Appendix A and B, respectively. The editorial response published with the March 11 letter is appended as Appendix C.

Reddick and PBR filed a complaint in December 1980 alleging defamation as a result of these two letters. In September 1983, the trial court entered summary judgment in favor of Craig and the Herald, ruling that Craig's letters were constitutionally protected expressions of opinion

and that Reddick and PBR had failed to show by clear and convincing evidence that the matters contained in the letters were published with knowledge that they were false or with reckless disregard of their falsity. We agree with the trial court.

## I.

▮ First Amendment questions of constitutional fact compel de novo appellate review. *Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d 315 (Colo.1981); *Russell v. McMillen*, 685 P.2d 255 (Colo.App.1984). Where, as here, a publication addresses a matter of public concern, it constitutes constitutionally protected speech unless the alleged defamatory statements are published with actual malice, *i.e.*, with knowledge that the statements are false or with reckless disregard of whether they are false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Burns v. McGraw Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983). To establish reckless disregard a plaintiff must produce clear and convincing evidence demonstrating that defendant, in fact, entertained serious doubts as to the truth of his publication. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Burns v. McGraw-Hill Broadcasting Co., Inc., supra.*

▮ Although Craig's analysis of an admittedly complex county budget may have led to an erroneous calculation of expenditures for land planning, there was no showing other than that he believed that the county had expended funds in excess of its planning budget. Moreover, even if Craig's figures were wrong, it has not been shown that his investigation was grossly inadequate. *Cf. Kuhn v. Tribune-Republican Publishing Co., supra.* Finally, although the Herald may have suspected that Craig's assertion of the extent of excess expenditure was in error, Craig had proved reliable in the past, and the Herald was entitled to rely on his general conten-

tion that the county had exceeded its planning budget. *See New York Times Co. v. Connor,* 365 F.2d 567 (5th Cir.1966). Thus, plaintiffs here failed to show with "convincing clarity" that Craig or the Herald acted with "actual malice." *See Manuel v. Fort Collins Newspapers, Inc.,* 661 P.2d 289 (Colo.App.1982).

As to the publication of the March 11, 1980, letter, the plaintiffs' assertion that Craig knew that the special prosecutor had found no illegalities in the appropriations for land use planning is not supported by the record.

The special prosecutor's report of February 14, 1980, stated:

"In conclusion, it appears from my investigation and analysis of the ... nine claims ... that the La Plata County Commissioners technically violated the Local Government Budget Law of Colorado in all nine claims. It is my recommendation, however, that the commissioners not be prosecuted under the malfeasance statute for the following reasons: ...

.....

"I do not mean to imply by my recommendation not to prosecute that the commissioners are without fault .... It is obvious that the commissioners have acted in an incompetent manner at times ...."

Also, in Craig's deposition, he acknowledged authorship of a letter to the Herald published on February 21, 1980. In that letter, Craig complained that although the special prosecutor found the *commissioners* had violated the Local Budget Law of Colorado, he refused to prosecute for malfeasance because he believed that they did not know they were violating the law, that some of their actions were taken upon the advice of counsel, and that they did not benefit personally from the illegal actions.

■ Additionally, there is nothing of record showing that the special prosecutor's report addressed *plaintiffs'* involvement or exonerated them from wrongdoing, nor is there evidence that Craig had been so informed. Furthermore, Craig's allegations of budgetary impropriety were at all times directed toward the La Plata County commissioners, not toward Reddick or PBR.

Thus, the record supports Craig's contention that he continued to believe that the La Plata County commissioners had expended funds in excess of the budget for land use planning, and that he relied upon the analysis of a certified public accountant in maintaining this conclusion. Accordingly, plaintiffs failed to prove with convincing clarity that Craig acted with "actual malice." *See Fink v. Combined Communications Corp.,* 679 P.2d 1108 (Colo.App.1984); *Manuel v. Fort Collins Newspapers, Inc., supra.*

Plaintiffs contend, however, that the actual malice standard was met as to the Herald because Craig's letter of March 11 was published with editorial acknowledgment that the Herald believed Craig's analysis to be erroneous and potentially libelous. We disagree.

■ Good faith is the linchpin in determining actual malice, and recovery will be denied if the publication was made in good faith even if the publication is erroneous and defamatory. *St. Amant v. Thompson, supra.* Here, although the Herald published Craig's March 11 letter with the belief that Craig's analysis was erroneous and *possibly* libelous, its patent good faith purpose for publication was to foster ascertainment of the truth about public affairs by editorial rebuttal of Craig's opinion.

Actual malice is not an evasive, abstract concept, hard to prove and hard to disprove. Thus, summary judgment is particularly appropriate in cases concerning actual malice. Here, Reddick and PBR failed to present specific facts showing with convincing clarity that a genuine issue of material fact exists as to actual malice, *see DiLeo v. Koltnow,* 200 Colo. 119, 613 P.2d 318 (1980); *Fink v. Combined Communications Corp., supra.* Accordingly, the trial court was correct in entering summary judgment in favor of defendants.

## II.

Furthermore, we hold that Craig's letters expressed constitutionally protected opinion.

Remarks disparaging the conduct of public officials must be considered against the background of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan, supra; see Lane v. Arkansas Valley Publishing Co.,* 675 P.2d 747 (Colo. App.1983). To that end, the Supreme Court extended special protection to political opinions when it stated: "There is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges or juries but on the competition of other ideas." *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

■ The Colorado Supreme Court acknowledged these principles in *Bucher v. Roberts,* 198 Colo. 1, 595 P.2d 239 (1979), which created a presumption favoring a finding of opinion in cases involving language which is of inherently speculative meaning. In *Burns v. McGraw-Hill Broadcasting Co., supra,* the Colorado Supreme Court reaffirmed *Bucher* as it pertains to "an essentially ambiguous statement, subject to conflicting interpretations," but also recognized that:

"Opinions may lose their constitutional protection when 'the average reader or listener or viewer perceived the comment as essentially assertion of fact, in light of the relative specificity of the language used and the relative insufficiency of the connection of such language to supporting fact.' "

■ Although an opinion which implies the existence of undisclosed false facts is not permitted, the *Burns* decision adheres to the rule of absolute protection for an opinion when the author sets forth the facts upon which it is based. Thus, if a reader can evaluate the alleged defamatory language because the basis of the statement has been disclosed, an action in defamation will not lie. *Burns v. McGraw-Hill Broadcasting Co., supra.*

Finally, *Burns* suggests three factors to be examined when speech which might be considered protected opinion is in issue: (1) Whether the statement of which complaint is made is cautiously phrased in terms of apparency; (2) whether the entire published statement, not just the objectionable word or phrase, when examined in context constitutes a statement of fact or voices an opinion; and (3) whether, in light of all of the circumstances surrounding the statement, including the medium through which it is disseminated and the audience to whom it is directed, the statement will be read as fact or opinion.

■ In the letter of December 13, Craig set forth as the basis of his budgetary analysis, Herald editor John Moore's article of June 9, 1977, the La Plata County budget record, and the "1978 Planning Services Agreement." As to the March 11 letter, Craig again referred to his review of the county budgets, including specific schedules thereto, and the appropriation adopted by Resolution No. 1979–86, which is quoted at length. He also referred to a report of the La Plata County auditor as well as an analysis of a certified public accountant.

Although the language in both letters is vehement, caustic, and at times unpleasantly sharp, the critical assertions are nevertheless couched in terms of apparency, *i.e.,* "I haven't checked the spending of city and grant monies in 1978, but if we *assume* PBR's income from those sources was as budgeted ...." (emphasis added) In all but one instance where the word "take" is employed, it is enclosed in quotation marks. Examining the letters in their entirety, we conclude the words "take," "rapist," "serious violation of commitment not to exceed the counties budget," "parlay," "an excess take," and "swindle," read in context, can only be understood as rhetorical hyperbole meant to express Craig's opinion that, insofar as Reddick and PBR were concerned,

the county taxpayers were simply not getting their money's worth. *See Lane v. Arkansas Valley Publishing Co., supra; see also Cinquanta v. Burdett,* 154 Colo. 37, 388 P.2d 779 (1964).

Furthermore, these letters were published by the Herald in the section entitled "Our Readers Say" where one would expect to find expressions of opinion. In our view, Craig did no more than use this forum to opine that the county taxpayers were paying too much for the services performed by Reddick and PBR.

Even if it is assumed that the underlying facts which provide the basis for Craig's opinion were erroneous, these facts were fully disclosed in each of the letters. Thus, because his opinions were not based on *undisclosed* false facts, they are constitutionally protected under the United States and Colorado Constitutions. *See Burns v. McGraw-Hill Broadcasting Co., supra.* As such, no liability can attach to their publication by Craig or the Herald.

Judgment affirmed.

BERMAN, J., concurs.

METZGER, J., dissents.

### APPENDIX A

Our readers say
Fantastic planning

TO THE EDITOR:

According to radio reports, Russ Reddick recently told the ARPC, Durango City Council, and La Plata County Commissioners that, in regard to the planning efforts in La Plata County, the achievements of the past two years have been FANTASTIC.

I agree.

After Reddick was interviewed for the planning consultant job, John Moore's article on the interview (reported June 9, 1977) includes: "PBR would work within the existing budget, he (Reddick) said. In the three years the firm has been working for Clear Creek County, he said it has never exceeded the county's budget."

We all read that in the newspaper. We haven't read in either newspaper (nor heard on the radio) how seriously that commitment has been violated.

The county budget for ARPC and its planning staff for 1977 was $35,792, (These groups had actually spent $24,762 of county money the previous year.) The county budget for PBR, which was placed under direct county commission control rather than through ARPC, was $50,000 for 1978.

Those readers interested in tromping down to the commissioners' office and looking at the county's budget for 1980 will note revealed in the document the fact that the county actually paid PBR $138,556 in 1978. This was $88,556 beyond the budget! [Note: In the letter as it appeared in the Herald, the preceding paragraph was repeated.]

Of course, the most generous county contribution was only part of the PBR "take" for 1978. The 1978 "Planning Services Agreement," prepared by Mr. Reddick for city and county approval, showed PBR's expected income to include $48,000 from the city $35,000 from "1041" Base and Supplemental grants for 1978, and $44,967 from such grants held over from previous years.

I haven't checked the spending of city and grant monies in 1978, but if we assume PBR's income from those sources was as budgeted, and add the $88,556 which the county paid PBR beyond the $50,000 budgeted, PBR's take from that single year from La Plata County would figure out as $266,523.

One must admire the skill of anyone who can parlay a $35,000 job into over a quarter million dollars in one year, haul a large portion of it out of the county to Denver and beyond, and leave a local audience applauding the performance. That is an achievement which is indeed FASTASTIC [sic].

I suppose there are rape cases in which the rapist is so skillful that he leaves the victim smiling and calling for more. In the case at hand, the elected city and county

officials seem to be smiling and calling for more. But it is the taxpayers of La Plata County who have been had.

Roy Craig
La Boca, Colo.

## APPENDIX B

Our readers say
Apology requested

TO THE EDITOR:

The effect of the editor's note following my letter which the Herald printed Feb. 21 was to cast doubt upon what I had said. Since that note contains information which is not factual, its printing appears to be a continuation of news media efforts to downgrade the seriousness of financial offenses committed by La Plata County Commissioners which La Plata County taxpayers have been trying to bring to light, and to make it appear that those offenses were trivial legal technicalities.

Just to make certain that the figures I used in that letter were correct, I asked a certified public accountant to examine the budget records and the 1978 auditors' report, all available for public inspection at the commissioners' office. The CPA has concluded that PBR was paid, as I claimed, over $88,000 more than was budgeted for them out of county funds in 1978, and that the auditors' report showed no possibility that $80,000 of this was furnished by the Colorado Division of Planning, as asserted in the editor's note.

A review of county budgets, which any good reporter could do quickly, shows most interesting figures. The 1978 budget provides $79,940 for "Planning and Zoning," including $50,000 of county funds for PBR. The 1979 budget, prepared near the end of 1978, still shows the "estimated current year" expenditures for the Planning and Zoning Office (from schedule 2–8) as $79,-940. Since county budgets are reviewed publicly before adoption, these are the figures seen by the

--------------------

See editorial

response below

--------------------

public. The public has a right to believe that is what is being spent for the stated purpose. The first public evidence that the county commissioners were, in 1978, spending many tens of thousands of dollars beyond their budget for "planning and zoning" appears in the 1980 budget record. In that budget, the column showing 1978 AC-TUAL (not estimated) expenditures reveals that $138,556 went to Consultant, identified as PBR.

The excess PBR "take" was not even appropriated for that purpose by the commissioners. (Any supplemental appropriation legally had to be only for unforeseeable contingencies, and the public informed that the extra money was to be spent.) A cover-up appropriation was made, six months after the end of the year in which the money was spent, by Resolution No. 1979–86, a copy of which I am furnishing the Herald and I hope the Herald will print for public view. PBR's extra $88,556 from the county is part of the $161,000 appropriated belatedly to the general fund by that resolution.

The resolution states "during fiscal 1978, it was necessary to expend county monies in excess of the original and revised budgets ...." Colorado law (CRS 29-1-113) says: "No contract to exceed appropriation. During the fiscal year, no officer, department, board, commission, or other spending agency shall expend or contract to expend any money, or incur any liability, or enter into any contract which, by its terms, involves the expenditure of money ... in excess of the amounts appropriated ... (for that purpose) ... for such fiscal year. Any contract, verbal or written, made in violation of this section shall be void as to the local government, and no moneys belonging thereto shall be paid thereon."

The spending in excess of budget was shown in the auditor's report for 1978, the draft version of which showed a shortage of $160,573 in the county's general fund. By advising the commissioners to pass an after-the-fact resolution to appropriate $161,000 to the General Fund in 1979 (for use in 1978 alas!) the auditors, it would seem, became accessories to illegal actions by the county commissioners, and party to a cover-up attempt. (So soon after Watergate?)

Twenty-five taxpayers have been trying to bring to light what an ex-member of the Animas Regional Planning Commission (and promoter of Russ Reddick and PBR) now calls "one of the most incredible swindles that have ever been pulled on a county." Whether or not the Herald's participation in the cover-up of that swindle is by intent, the editor's note referred to above contributed to that effort. Casting doubt upon my arguments casts doubt on my personal integrity. I feel that the Herald owes me an apology.

Roy Craig
LaBoca, Colo.

APPENDIX C

No apology given

"Located directly above this editorial is a letter to the editor from Roy Craig of LaBoca, Colo., under the headline 'Apology requested.' You should read that letter before continuing through this editorial. In his letter, Craig requests an apology from the Herald for the editor's note we ran in conjunction with his letter to the editor of Feb. 21.

This is not that apology.

In his Feb. 21 letter, Craig wrote that the Phillips Brandt Reddick planning staff exceeded its 1978 budget by $88,000. In our editor's note, we quoted PBR planner-in-charge Dallas Reynolds and La Plata County commissioners' administrative assistant Wes Howe as they gave explanations for those expenditures.

In today's letter, Craig states that his original figures were correct and our editor's note cast doubt upon his integrity. He also implies that the county commissioners and PBR acted illegally in spending the money and that the county's auditors and the Herald might be accessories to that illegal action by covering it up.

On the surface, Craig's figures are correct. The 1978 La Plata County budget listed $50,000 as a line item to be spent for PBR as part of $79,940 to be spent for planning and zoning. The 1979 budget listed estimated expenditures for 1978 and used the same figures. The 1980 budget listed actual expenditures for PBR in 1978 as $138,556.

The audit of the county's 1978 books, completed in April 1979, listed total planning and zoning expenditures of $152,992, which matches with the county's final figures when planning money for Region 9 and the Soil Conservation Service are included. The audit, however, does not break out the budget on a line item basis in any department. Nor does it attempt to explain the expenditure over the budget.

We might agree with Craig if he questioned the county's budgeting procedure and why, when the 1979 budget was prepared in August 1979, the estimated expenditures did not more accurately reflect the increase, and why the budget does not list what those increases are.

Unfortunately, Craig and his certified public accountant did not look far enough to find the 'missing' $88,000. The money is all listed in public records, approved by the commissioners and available in the bills to the county from PBR.

Part of the explanation of PBR expenditures is timing. The 1978 budget was initially prepared in August 1977 and adopted in November 1977. Part of the funds spent by PBR in 1978 came to the county from the state of Colorado and were not received or even known to be available until after that budget was adopted.

In addition to the line item of $50,000 to PBR from county revenues in 1978, the

original budget prepared in August 1977 lists $15,000 in state planning funds from the House Bill 1041 program. That money is set up by the state to go to each county's planning program and, as occurred in La Plata County prior to PBR being hired, that money went to the planning office to implement its work program.

That brings the county's payment to PBR in 1978 to $65,000.

In November 1977, the city, county and School District 9–R tentatively agreed to redesign the entrance to the Fairgrounds and high school. Under a contract separate from its work as planners for the city and county, PBR was hired to design the entrance. The work was done in 1978 and the county paid PBR $2,125 for it.

That brings the county's payment to PBR in 1978 to $67,125.

In February 1978, John Tomsic of the Colorado Division of Planning conducted an audit of H.B. 1041 funds given to the county in 1976 and 1977, prior to PBR being hired. Although there is no written record available of the results of that audit, those persons involved from the state, county and PBR recall the conversations. The state informed the county that $33,976 of work it had contracted for from the state, and which it had been paid for, had not been completed.

Consequently, Ken Francis, the local Division of Planning representative, prepared in late February 1978 a budget of state funds for the county which listed $44,967 in carryover funds from the 1977 and 1978 budgets. That included the $33,967 in land suitability maps the county said it would do and had been paid by the state to do. It also included $11,000 in a supplemental H.B. 1041 grant that the county agreed in August 1977 to use for goals and objectives and public participation in planning, rather than its initial purpose of mapping. The state agreed to that change and the county designated PBR as the agency to perform the work.

That brings the county's payment to PBR in 1978 to $112,092.

Under the H.B. 1041 supplemental grant program in 1978, the city and county applied for and received $20,000 to be used for creation of land use regulations, land suitability studies, the Durango comprehensive plan update and the open space and recreation plan. All the work was to be done by PBR.

The county signed the contract for $10,000 of supplemental funds on June 27, 1978. Because of delays in payment from the state for work completed, including the city's $10,000 state grant, members of the PBR staff met with the commissioners on Oct. 17, 1978, and the commissioners, according to the minutes of that meeting, stated 'the county will handle this difference in the planning funds this year and the board will discuss this with the city for next year.'

That brings the county's payment to PBR in 1978 to $132,092.

All of those figures—excluding the contract on the Fairgrounds' entrance design—were included in PBR's contract with the city and county, which was discussed at length at open meetings and signed by both the board of county commissioners and city council, after each adopted resolutions accepting the contract, on April 28, 1978.

Also, on July 2, 1978, in a front page story in the Herald, the PBR budget was reviewed. The third and fourth paragraphs of that article stated:

'For 1978, the planning firm has a budget of $177,960, he (PBR-Colorado president Russ Reddick) said.

'Of that budget, $50,000 comes from the county, $48,000 comes from the city, $15,000 is a state base grant for planning, $20,000 is a state supplemental grant for planning and $44,967 is state money carried over from 1976 and 1977 for work programs that were not completed in those budget years.'

Those agreed upon, public expenditures from the county, plus the Fairgrounds' contract, total $132,092, which is $6,464 less than the $138,556 that is listed as actual expenditures by PBR in 1978.

The firm, in its contract with the county, states that expenses over and above the contractual items may be billed to the county, after first receiving written or verbal agreement. In addition to its direct, contracted expenses in 1978, PBR did such things as reproduce copies of the Land and Resource Management Program, and also photographed numerous planning and land suitability maps. We have not conducted a fine-tune audit of the firm's billings to the county to trace that additional $6,464. But, based on the completeness of the firm's bills, we feel comfortable that money can be accounted for.

With the exception of the Fairgrounds' contract and noncontracted expenditures, the funds spent by PBR in 1978 above the initial budget of $65,000 were state funds or for state-mandated programs.

For some time, Roy Craig has been a loud, vocal opponent of land use planning in the county, of the PBR firm and of commissioners who support planning.

He has threatened the recall of the commissioners. He is the lead defendant in a lawsuit filed against the commissioners, based primarily on expenditure of planning funds. He is chairman of an organization that is bent on eliminating land use planning as it exists in the county today. And, he has written numerous letters to the editor, culminating in the one published above.

We have been advised that Craig's letter we are publishing today may be libelous. We acknowledge that possibility. He potentially libels PBR, the auditing firm of Lehman & Butterwick, the county commissioners and the Herald. We have decided to publish his letter, at the risk of facing a libel suit, to show the extent to which he is going in fogging figures and attempting to ruin reputations in his vendetta against planning and those who support it.

In our extensive investigation of Craig's charges since we received his letter on Feb. 27, we found no excess expenditures. We found no cover-up. We found no 'swindle.'

We will not give him an apology.

But we believe he owes an apology to the Herald, to Lehman & Butterwick, to the past and present members of the La Plata County Board of Commissioners and to Phillips Brandt Reddick."

John Moore
Editor

METZGER, Judge, dissenting.

I respectfully dissent.

### I.

In my view, the facts here do meet the standard of clear and convincing evidence required to permit a conclusion that defendants entertained serious doubts as to the truth of their publications. Consequently, a jury should have been allowed to determine that issue, and the trial court's entry of summary judgment was erroneous. *See St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351 (Colo.1983).

Proof of actual malice calls a defendant's state of mind into question and does not readily lend itself to summary disposition. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). A trial court, in determining whether an issue as to actual malice is present, must ascertain whether:

> " 'The plaintiff has offered evidence of a sufficient quantum to establish a prima facie case, and the offered evidence can be equated with the standard or test of 'convincing clarity' prescribed by United States Supreme Court decisions....' "

*DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980) (emphasis omitted).

To establish reckless disregard, a plaintiff must produce sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *St. Amant v. Thompson, supra.*

The record shows that, prior to the publication of the March 11, 1980, letter, Craig was aware that the special prosecutor had issued his report and he was aware of the contents of that report. Craig further ad-

mitted that he knew that the figures he used in the letter were wrong. Despite this knowledge, Craig maintained that PBR, Reddick, and the county commissioners had "swindled" the county, and that the Herald had participated in the "cover-up."

The letter does not support the majority's assertion that "Craig's allegations of budgetary impropriety were at all times directed toward the La Plata County Commissioners not toward Reddick or PBR." The clear import of the letter's language is that Reddick and PBR "pulled a swindle" on La Plata County. Indeed, Craig in his deposition stated that the common meaning of "swindle" is to "take money under false pretenses."

Moreover, the Herald admitted that the December 1979 letter contained statements based upon what it knew to be inaccurate underlying figures. This admission would sustain a finding of actual malice as to this letter.

As to the March 11, 1980, letter, which the editor of the Herald stated "might be libelous," the Herald argues that its investigation and subsequent editorial, which refuted Craig's statements, protect it from liability. However, a re-publisher is not relieved from liability by stating that he does not believe the allegations contained in the re-publication. Restatement Second of Torts § 578 comment e (1976).

Consequently, the evidence here constitutes a prima facie case as to malice sufficient to withstand summary judgment.

## II.

Furthermore, I cannot agree with the majority's conclusion that the letters expressed constitutionally protected opinion.

It is libelous *per se* to charge a person falsely with a crime, and the charge need not be made in the language of the statute. *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966). In essence, the December 13, 1979, letter imputes criminal activity to PBR and Reddick, since it accuses them of manipulating the La Plata County Commissioners into exceeding the coun-

ty's budget. Thus, I fail to see how that letter can be enclosed under the mantle of constitutionally protected opinion.

In the March 11, 1980, letter, Craig claims that a certified public accountant verified the figures in support of his findings that payments were made to PBR in excess of budgeted funds. However, Craig did not disclose that the certified public accountant was his friend, was retired, and may not have been currently certified. Nor did the letter disclose that the CPA was a sympathizer of the Landowner's Association which had opposed PBR's work from the outset, and whose activities Craig had spearheaded. Most importantly, Craig failed to disclose that the accountant's conclusions were based upon the limited number of documents Craig supplied to him and which Craig admitted were incomplete.

The same March 11, 1980, letter also states that an unidentified ex-member of the local planning commission and former "promoter" of Reddick described the payments to Reddick and PBR as an "incredible swindle." This statement implies knowledge by two insiders in the controversy—Craig and the ex-planning commissioner—that Reddick and PBR had swindled La Plata county. However, Craig's letter does not disclose any underlying facts which would support the conclusions of Craig, the CPA, or the former planning commissioner.

Craig neither disclosed all the facts in a neutral fashion, nor toned down his rhetoric. Rather, he used such words as "swindle," thus leading the average reader to conclude the worst, without knowing the underlying bases for Craig's claims. In my view, Craig's opinions are based upon undisclosed false and defamatory facts, *Burns v. McGraw-Hill Broadcasting Co., Inc., supra,* and thus, they are not protected under the United States or Colorado Constitutions.