447 S.E.2d 293

**Stan MAYNARD, Plaintiff Below, Appellee,**

v.

**The DAILY GAZETTE COMPANY, a corporation, dba The Charleston Gazette, Defendant Below, Appellant.**

**No. 21815.**

Supreme Court of Appeals of West Virginia.

Submitted May 4, 1994.

Decided July 20, 1994.

**4.** To the extent that this Court's order in *Chapman* is inconsistent with this opinion, it is overruled.

John H. Bicknell, Greene, Ketchum, Bailey & Tweel, Huntington, for appellee.

Rebecca A. Baitty, Lutz, Webb, Partridge, Bobo & Baitty, Sarasota, FL, and Rudolph L. DiTrapano, DiTrapano & Jackson, Charleston, for appellant.

BROTHERTON, Chief Justice:

The appellant, The Daily Gazette Company, publisher of the Charleston Gazette newspaper, appeals from the February 17, 1993, order of the Circuit Court of Cabell County, West Virginia, which sustained a jury verdict for the appellee, Stan Maynard, a professor of education at Marshall University and the former director of Marshall University's Student Athlete Program.

Maynard filed a defamation suit against the Gazette after the newspaper published the following editorial on April 21, 1989:

### "Student Athletes"

We assume that coach Rick Huckabay's unexplained ouster at Marshall University was at least partly caused by the scandalous graduation rate among the basketball players he recruited—a mere four in the past six years.

But others share in that failure. What about President Dale Nitzschke, Athletic Director Lee Moon and former Athletic Director David Braine? Why aren't leaders also held accountable when dozens of functional illiterates are kept as make-believe students to thrill crowds and alumni, then dumped with no education? University presidents and athletic directors everywhere are adept at insulating themselves from the sports cesspools that go so far toward paying their salaries.

And what about the little people, the non-luminaries, who prop up the system? What about the Stan Maynards?

Maynard is an associate professor of teacher education at Marshall. He is in charge of the academic counseling, tutoring and monitoring program designed to see that Marshall athletes go to class, make decent grades, study and ostensibly, make real progress toward real degrees.

In the past, Maynard reaped favorable publicity and community goodwill from the supposed success of his program—so much goodwill, in fact, that he was able to parlay it into a Marshall basketball scholarship for his son. But, in hindsight, it appears that Maynard was interested chiefly in maintaining the athletic eligibility of his charges, not in their academic progress or career prospects. Men like Maynard are part of the corruption of college athletics.

It's proper to fire coaches who make the phrase 'student athlete' a topic of derision. But coaches aren't the only culprits in this sorry system.

The appellee alleges that this editorial is defamatory on its face because it "falsely accused Professor Maynard of using his position and influence to obtain a scholarship for his son, ... of not being concerned for the academic progress or career prospects of Marshall University Student Athletes, ... of corruption, falsely characterized Professor Maynard as a 'culprit' and implied that he should be fired from his job at the university."

Maynard, Don Perry, and Marshall basketball coach Rick Huckabay founded the Student Athlete Program in 1983. The goal of this self-improvement program was to offer better opportunities for the "whole student," by assisting student-athletes in their classroom work and in other areas of college life. The program drew considerable media attention, including a feature during a nationally televised basketball game. Because of the publicity received by the program and by Maynard personally as its director, Maynard stipulated at trial that he was a limited purpose public figure. This meant that under the United States Supreme Court's decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, Maynard could not prevail on a defamation claim unless he proved, by clear and convincing evidence, that the Gazette made false and defamatory statements about him and did so with actual malice.

After deliberating for a little over an hour, the jury returned a verdict awarding Maynard $1.00 in compensatory damages and $160,000.00 in punitive damages. Final judgment was entered against the Gazette on June 26, 1991. The circuit court subsequently upheld the $160,000.00 punitive damage award by order entered February 17, 1993.

The Gazette now asks this Court to reverse the lower court's order, arguing that the editorial was not defamatory, contained no provably false assertion of fact, and that the evidence fails to establish that the defendant acted with actual malice.

■ " ' "Under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), whenever there is a First Amendment defense to actions under state law, the state court is required to be a judge of both the facts and the law...." Syllabus Point 2, in part, *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981).' Syllabus point 5, *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986)." Syl. pt. 2, *Dixon v. Ogden Newspapers, Inc.*, 187 W.Va. 120, 416 S.E.2d 237 (1992). This Court is required to conduct "an independent review of the evidence in libel cases to determine, as a matter of constitutional law, whether the statement was libelous or was made with actual malice." *Long v. Egnor*, 176 W.Va. 628, 634, 346 S.E.2d 778, 784 (1986). However, " '[a] court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning.' Syllabus point 6, *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986)." Syl. pt. 3, *Dixon v. Ogden Newspapers, Inc.*, 187 W.Va. 120, 416 S.E.2d 237 (1992).

■ Before examining the specific charges of defamation that are set forth in this case, we note the privileges that are afforded to the form of expression known as "opinion." "Following *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), courts have held that statements of opinion are absolutely protected under the First Amendment and cannot form the basis for a defamation action. These courts also hold that whether a statement is one of fact or opinion is an issue that must be decided initially by a court." Syllabus point 7, *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986).

In its more recent decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the United States Supreme Court elaborated on *Gertz*, and, in the process, the Court refused to recognize "still another First Amendment-based protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.' " *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2705. "Rather than recognize a constitutional distinction between 'fact' and 'opinion,' the Court recognized a constitutional distinction between 'fact' and 'non-fact.' The Court thus changed the terminology of constitutional law in *Milkovich*, but not the underlying sub-

stance." Rodney A. Smolla, *Law of Defamation* § 6.02[1] (1994).

Confusion had arisen in lower courts following *Gertz* as a result of the following passage:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3007. The *Milkovich* Court explained it did not think that this famous and often-cited dictum from *Gertz* "was intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'.... Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705.

Rejecting the opportunity to require courts to conduct a preliminary inquiry into whether a statement is "opinion" or "fact," the *Milkovich* Court concluded that "the ' "breathing space," ' which ' "[f]reedoms of expression require in order to survive" ' [*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783, 790 (1986) ] (quoting *New York Times*, 376 U.S., at 272, 84 S.Ct., at 721), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." *Milkovich*, 497 U.S. at 19, 110 S.Ct. at 2706.

Of particular relevance to our analysis in this case is the fact that the Court then went on to explain that its decision in *Hepps* "stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law...: *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 19–20, 110 S.Ct. at 2706. "Since plaintiffs in cases involving issues of public concern clearly have the burden of proof—an issue resolved in *Philadelphia Newspapers, Inc. v. Hepps* —then defendants ought to prevail when verifiability of the statement is doubtful, since a plaintiff unable to demonstrate that the truth or falsity of a statement is provable by definition cannot meet the burden of establishing falsity." Smolla, *supra* at § 6.07[2].

■ There is no question that the editorial opinion expressed in the case now before us involved a matter of public concern. Thus, we must determine whether the article contained a provably false factual connotation and is therefore not entitled to full constitutional protection. The jury was instructed that the Gazette editorial could not be considered defamatory to Professor Maynard unless it would reflect shame, contumely or disgrace upon him or unless it falsely charges him with a crime or personal dishonesty. The Gazette maintains that the following challenged statements fall far short of this standard:

> (1) that he "was able to parlay [the favorable publicity and good-will generated by his program] into a Marshall basketball scholarship for his son;"
>
> (2) that, "in hindsight, it appears that Maynard was interested chiefly in maintaining the athletic eligibility of his charges, not in their academic progress or career prospects;" and
>
> (3) "Men like Maynard [—"the little people, the non-luminaries who prop up the system"—] are part of the corruption of college athletics."

We agree with the Gazette's argument that the editorial is not defamatory, whether examined statement-by-statement in a "piecemeal" fashion, or read as a whole and taken in context, as the appellee urges us to do now.

In addition to its placement on the newspaper's editorial page, the tone of the article indicates that the writer is setting forth her opinion. In fact, the manner in which the writer begins the editorial immediately suggests that she is engaging in a bit of conjecture:

> *We assume* that coach Rick Huckabay's *unexplained* ouster at Marshall University

was at least partly caused by the scandalous graduation rate among the basketball players he recruited—a mere four in the past six years. (Emphasis added.)

The writer then shifted the focus away from the former head basketball coach and began to assign blame for the low graduation rate to other participants in the University program, before reaching her ultimate conclusion that "coaches aren't the only culprits in this sorry system." Explaining that "others share in the failure," the writer singled out "leaders" such as then Marshall University President Dale Nitzschke, athletic director Lee Moon, and former athletic director David Braine, as well as "the little people, the non-luminaries who prop up the system? What about the Stan Maynards?"

The writer then discussed Maynard's role in the athletic program and opined as to why she felt that he also shared in what she perceived as its failure. While urging us to read the editorial as a whole and not take words or sentences out of context, Maynard himself takes particular exception to the following sentence:

In the past, Maynard reaped favorable publicity and community goodwill from the supposed success of his program—so much goodwill, in fact, that he was able to parlay it into a Marshall basketball scholarship for his son.

Maynard argues that this sentence falsely accuses him of using his position and influence to obtain a scholarship for his son. However, two essential and verifiable facts connected with this statement are that Maynard was in charge of Marshall's Student Athlete Program and his son was awarded a Marshall basketball scholarship. Irrespective of any evidence that might be offered to show that one thing did not lead to the other, this is not something that can ever be ascertained with certainty to the satisfaction of a questioning public. In other words, this statement cannot be objectively characterized as either true or false, and thus, it is not

a provably false assertion of fact. Rather, it simply reflects the opinion of the writer, and perhaps of others who follow Marshall athletics and choose to form an opinion one way or the other. Charges of favoritism and nepotism flourish in environments where people compete for positions, and no amount of independent or objective evidence is likely to appease those who make an issue of this incident and whose minds are already made up.[1]

We believe it is important to point out that this Gazette editorial was not the first to bring the subject of the scholarship to the public's attention. Long before the publication of the Gazette editorial that is the subject of this case, Marshall head basketball coach Rick Huckabay addressed the controversy in a December 8, 1988, article in the *Huntington Herald Dispatch,* which observed that Maynard was the only freshman Coach Huckabay recruited that year. Huckabay stated: "He's much better than people give him credit for ... [E]verybody thinks that the only reason that we got this kid is because of who his father is."

Similar observations appeared in other sports columns. An article in the April 30, 1988, *Huntington Herald Dispatch* began by stating that Marshall's basketball program "was recruiting big men, which didn't leave much room for a 6-foot-2 shooting guard [describing Maynard]." The article concluded by noting that "[t]he Maynard household is full of Herd fans, including his father, Stan, who is an associate professor at Marshall and director of the athletic department's Student–Athlete program." Also, in a Gazette article published on May 5, 1988, sports columnist Danny Wells stated that "a lot of eyebrow-raising took place when Marshall decided to sign ... 6-2 guard Stan Maynard. Maynard's dad Stan Maynard is on the Marshall faculty and helped organize the student athletic-athlete academic program."

---

1. At trial, the writer of the Gazette editorial, Diana Jividen, testified that she "looked at the playing time of Stan Maynard, Jr. and noted that he did not play" very much his freshman year. Head Coach Rick Huckabay resigned soon thereafter. Athletic Director Lee Moon testified that

new Head Coach Dana Altman evaluated Stan Maynard, Jr., and concluded that he was not athletic enough to contribute to the team. Stan Maynard, Jr., left Marshall University after his second year there.

After considering all of these facts in the context of the ongoing controversies that often swirl around collegiate athletic programs, we cannot find that the writer's expression of opinion on this point is defamatory.

We reach the same conclusion with regard to the writer's opinion that "[i]n hindsight, it appears that Maynard was interested chiefly in maintaining the athletic eligibility of his charges." Once again, this statement cannot be objectively characterized as either true or false. Moreover, we note that it is "cautiously phrased in terms of apparency." *Reddick v. Craig,* 719 P.2d 340, 344 (Colo.App.1985). In *Reddick,* the chief operating officer of a land use planning company (PBR) filed suit against the chairman of a county landowners association (Craig) and a newspaper, alleging defamation as a result of two letters written by the chairman and published in the newspaper. The letter concluded as follows:

> One must admire the skill of anyone who can parlay a $35,000 job into over a quarter million dollars in one year, haul a large portion of it out of the county to Denver and beyond, and leave a local audience applauding the performance. That is an achievement which is indeed FASTASTIC [sic].
>
> I suppose there are rape cases in which the rapist is so skillful that he leaves the victim smiling and calling for more. In the case at hand, the elected city and county officials seem to be smiling and calling for more. But it is the taxpayers of La Plata County who have been had.

*Id.* at 345–46.

The Colorado Court of Appeals decided that Reddick and PBR "failed to present specific facts showing with convincing clarity that a genuine issue of material fact exists as to actual malice...." and also found "that Craig's letters expressed constitutionally protected opinion." *Id.* at 343–44. The court stated:

> Although the language in both letters is vehement, caustic, and at times unpleasantly sharp, the critical assertions are nevertheless couched in terms of apparency, *i.e.,* "I haven't checked the spending of city and grant monies in 1978, but if we *assume* PBR's income from those sources

was as budgeted...." (emphasis added) In all but one instance where the word "take" is employed, it is enclosed in quotation marks. Examining the letters in their entirety, we conclude the words "take," "rapist," "serious violation of commitment not to exceed the counties budget," "parlay," "an excess take," and "swindle," read in context, can only be understood as rhetorical hyperbole meant to express Craig's opinion that, insofar as Reddick and PBR were concerned, the county taxpayers were simply not getting their money's worth. *See Lane v. Arkansas Valley Publishing Co.* [675 P.2d 747 (Colo.App.1983) ] *supra; see also Cinquanta v. Burdett,* 154 Colo. 37, 388 P.2d 779 (1964).

> Furthermore, these letters were published by the Herald in the section entitled "Our Readers Say" where one would expect to find expressions of opinion. In our view, Craig did no more than use this forum to opine that the county taxpayers were paying too much for the services performed by Reddick and PBR.

> Even if it is assumed that the underlying facts which provide the basis for Craig's opinion were erroneous, these facts were fully disclosed in each of the letters. Thus, because his opinions were not based on *undisclosed* false facts, they are constitutionally protected under the United States and Colorado Constitutions. *See Burns v. McGraw–Hill Broadcasting Co.* [659 P.2d 1351 (Colo.1983)], *supra.* As such, no liability can attach to their publication by Craig or the Herald.

*Id.* at 344–45.

In the case now before us, the language used in the editorial was not nearly as "vehement," "caustic," or "unpleasantly sharp" as that found in *Reddick.* Nevertheless, the appellee states that "[t]he editorial specifically mentions Professor Maynard five times, singles him out as a corrupt culprit and implies that he should be fired." The appellee contends that "[i]t is difficult to believe how anyone could read this editorial without coming away with the distinct impression that Professor Maynard's character is being attacked as dishonest, unethical, immoral, and indeed, criminal."

"Accusations of criminal activity, even in the form of opinion, are not constitutionally protected.... there is a critical distinction between opinions which attribute improper motives to a public officer and accusations, in whatever form, that an individual has committed a crime or is personally dishonest. No First Amendment protection enfolds false charges of criminal behavior." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 366 N.E.2d 1299, 1307, 397 N.Y.S.2d 943, 951 (1977). However, contrary to the appellee's assertions, the Gazette editorial does not suggest that Maynard was engaged in criminal conduct, nor that Maynard was a "corrupt" individual. The word "corruption" appears only once in the article, and there it refers to the corruption of an entire system, i.e., "the corruption of college athletics."

In *Henry v. National Association of Air Traffic Specialists, Inc.,* 836 F.Supp. 1204 (D.Md.1993), the plaintiffs alleged, among other charges, that the defendants called them "corrupt" in two letters published to 1700 union members. The statement in one letter reads: "Lord Acton, of the British Parliament two hundred years ago said, 'Power corrupts, and absolute power corrupts absolutely!' Perhaps that is what happened to Bruce." *Id.* at 1215. The other similar letter contains the following: "There is a saying from the British Parliament that is over two hundred years old which states: 'Power corrupts, and absolute power corrupts absolutely,' [sic] perhaps that is what happened to both Robin and Bruce." *Id.*

The district court found that the letter "does not expressly state that the plaintiffs are corrupt. Nor does the statement intimate that the plaintiffs have taken bribes or sold favors ... At best, the statement merely suggests that the plaintiffs have been corrupted by their positions within the NATTS. Nothing in the entire letter suggests that the plaintiffs have engaged in criminal activity." *Id.* at 1216. The court also noted that "of the eleven entries listed in the definition of the verb 'to corrupt,' only one even suggests an illegal act." *Id.* The Court ultimately held that "[b]ecause the statement about corruption ... is not capable of objective characterization as either true or false, ... the statement is not actionable as libel:"

... the use in this case of a well-known and ubiquitous quotation about power's corrupting influence is simply "incapable of positive proof." *Potomac Valve [& Fitting, Inc. v. Crawford Fitting Co.,]* 829 F.2d [1280] at 1289 [ (4th Cir.1987) ]. This is not a case in which false statements about corruption contain "strong undertones of illegality" and connote "illegal and unethical actions." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 949, 951, 366 N.E.2d 1299, 1305, 1307, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). This Court concludes that the statement about the corrupting influence of power was "loose, figurative, or hyperbolic language" that any reasonable reader would discount. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707.

*Id.* at 1216–17.

■ Likewise, we conclude that the allegedly libelous Gazette editorial is not actionable as such, because it does not contain any provably false assertions of fact. A statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection. Words such as "parlay," "corruption," and "culprits" are nothing more than the sort of exaggerated rhetoric that one expects to read in opinion-editorial columns, which are intended to spark debate on matters of public concern. The editorial is merely the expression of one writer's opinion, and it cannot reasonably be interpreted as an implication that the appellee has engaged in any type of criminal behavior.

For the foregoing reasons, the February 17, 1993, order of the Circuit Court of Cabell County is reversed.

Reversed.