490 S.E.2d 880

**Fred E. HUPP, Appellee,**

**v.**

**Emery L. SASSER, Susan Bohna, Defendants Below,**

**University of West Virginia Board of Trustees, Defendant Below, Appellant.**

**No. 23346.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 29, 1997.

Decided July 17, 1997.

William C. Garrett, Gassaway, Joyce Morton, Van Nostrand & Morton, Webster Springs, for Appellee.

Bruce A. Kayuha, Rose, Padden & Petty, Morgantown, for Appellant.

PER CURIAM:

The University of West Virginia Board of Trustees ("University") appeals from the Circuit Court of Monongalia County's denial of its motions for directed verdict and for judgment notwithstanding the verdict in a civil suit brought against it by Appellee Fred E. Hupp, a former graduate student, that involved allegations of defamation, breach of contract, and denial of due process. The University assigns as error the trial court's failure to rule that the alleged defamatory statements lacked defamatory content, that it did not publish any communication defaming Mr. Hupp, and that the communications were privileged. Also assigned as error are the trial court's failure to rule that Mr. Hupp had no constitutionally protected property interest in reappointment as a graduate teaching assistant and the trial court's failure to rule that if such a property interest did arise, Mr. Hupp received due process with regard to the complaints against him.[1] Upon a review of the record, we determine that the circuit court erred by failing to direct a verdict in the University's favor on Appellee Hupp's defamation claim based on the lack of defamatory content contained in those statements. Because we determine that Mr. Hupp did not have a constitutionally protected property interest in reappointment, we further find that the lower court erred in not granting the University's motion for directed verdict on the issue of due process. The verdict is upheld on the breach of contract issue as no assignment of error was raised with regard to it.

The University hired Mr. Hupp as a graduate assistant for its school of journalism for the spring semester of 1992. During the course of the semester, Emery Sasser, the dean of the journalism school, received several complaints from undergraduate students regarding Mr. Hupp's alleged unprofessional and intimidating behavior toward them. Additional complaints regarding Mr. Hupp were received by Thomas Sloane, then assistant dean of student life. Susan Bohna, an instructor in the journalism school, both received complaints regarding Mr. Hupp and was the recipient of Mr. Hupp's abusive behavior. Complaints regarding Mr. Hupp's behavior were also submitted in the form of anonymous student evaluations.

Mr. Hupp was confronted with the complaints against him in a meeting with Dean Sasser and Jon Reed, general counsel for the University, on April 21, 1992. Mr. Hupp acknowledges that, during the course of this meeting, he was apprised of the fact that students had complained of his bullying and abusive behavior towards them; that two females had complained of unwanted touching and fear of being alone in the classroom with him; and that students had complained of threats made in connection with their grades, his use of vulgar language, and his acting generally in an unprofessional manner. He was not apprised, however, of the identity of the complaining students.

Despite Dean Sasser's serious reservations regarding Mr. Hupp's continuation as a graduate assistant for the Fall 1992 semester, he was offered such a position[2] upon "the strict condition: [that] [a]ny creditable complaint of vulgarity, acts of intimidation, bullying or unprofessional behavior toward students, faculty or staff of the School of Journalism will result in the immediate termination of your

---

1. A final assignment of error, which we find unnecessary to address, is that the jury was motivated by passion, prejudice, or a misunderstanding of law, due to the identical award of $50,000 for each of Mr. Hupp's three theories. The University contended that, whereas the $50,000 award on the breach of contract claim could arguably be supported by the damage evidence introduced by Mr. Hupp on this theory, the iden-

tical award of damages on the other two theories without additional damage evidence suggests the award was motivated by passion, prejudice, or some misunderstanding of the law.

2. Apparently, the Dean's decision to offer Appellee a position for the Fall semester was influenced by a faculty meeting.

employment as a graduate assistant." Mr. Hupp refused to sign a written offer, dated July 31, 1992, which contained this condition, based on his position that by signing the document he would have been admitting to certain infractions. Mr. Hupp replied to Dean Sasser that he had been advised by his attorneys not to sign the offer, that he had and would continue to "redouble ... [his] efforts to be sensitive to the needs of my students[,]" but that he wanted to be treated similar to every other graduate assistant "with regard to normal critiques and suggestions for improvements." Dean Sasser reworded the terms of the offer to Mr. Hupp in a memorandum dated August 28, 1992, modifying the conditional language to state that "you will give particular attention and effort toward maintaining appropriate and professional behavior and attitude in the performance of your duties and in your dealings with others during the assistantship." Mr. Hupp refused to sign this second written offer of employment and the assistantship was eventually awarded to another individual.

Mr. Hupp filed suit pro se[3] against the University, Dean Sasser,[4] and Susan Bohna[5] on March 11, 1993, alleging defamation, breach of contract, and denial of due process. Following a four-day jury trial in February 1995 and the denial of the University's motions seeking a directed verdict on the defamation and due process claims, the jury awarded Mr. Hupp $150,000—$50,000 on each of Appellee's three theories. The University moved for a judgment notwithstanding the verdict, or alternatively, a new trial. The University appeals from the denial of those motions, as well as the trial court's failure to grant a directed verdict in its favor on Appellee's defamation and due process claims.

3. Mr. Hupp's current counsel filed a notice of appearance with the circuit court on October 21, 1993.

4. Dean Sasser was dismissed from the proceeding in his individual capacity by directed verdict at the close of defendant's case in chief.

## I. DEFAMATION

This Court, in syllabus point one of *Crump v. Beckley Newspapers, Inc.,* 173 W.Va. 699, 320 S.E.2d 70 (1983), held that: "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." The assignments of error at issue in this case relate to elements one and two as set forth in *Crump.* Specifically, the University asserts that the trial court erred in concluding that the five statements at issue were defamatory in nature, that these statements were published, and that the statements were not privileged communications, and thus outside the realm of defamation.

Necessary to our discussion is a synopsis of the five[6] allegedly defamatory statements, each of which were made by Dean Sasser. Statement one involved Dean Sasser stating to Professor Schie, a journalism school faculty member, in a local bar in April 1992: "I guess you've heard about the problems we're having with Hupp." After receiving a negative response, Dean Sasser stated that there were numerous complaints against Mr. Hupp for his alleged "abusiveness" and "unprofessional behavior." The second statement concerns remarks made by Dean Sasser to faculty member Dr. Lynn Hinds on April 21, 1992, that "I know he's [Mr. Hupp's] a bully. He tried to bully me." Statement three was contained in a letter from Dean Sasser to Mr. Hupp, as well as several other faculty and administrative personnel and University counsel, dated July 31, 1992, that referenced Mr. Hupp's "unprofessional behavior toward students, faculty, staff, and administrators during spring semester 1992." The fourth allegedly defamatory statement was made by Dean Sasser when he noted Mr. Hupp's "un-

5. Ms. Bohna was dismissed from the case on her motion for a directed verdict at the close of plaintiff's case in chief.

6. At trial, two additional statements made by Susan Bohna were at issue as allegedly defamatory. Given the dismissal of Ms. Bohna from the lawsuit, however, we need not examine those statements.

acceptable behavior" in a writing to Professor Lynn Hinds. The final statement postdates the filing of the complaint and concerns Dean Sasser's letter dated April 22, 1993, to Dr. Lynn Hinds directing that Mr. Hupp "is not authorized to use any equipment or facilities of the School of Journalism" and that Dr. Hinds was to "prevent him from using any facilities of the School."

■ As we recognized in syllabus point six of *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986), "A court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning." While Appellee argues that the trial court was presented with this issue on three separate occasions (and suggests that the lower court thrice ruled in his favor), our review of the record does not support Appellee's assertion. The University first raised the issue of lack of defamatory character with regard to the statements at issue in its motion for summary judgment. The trial court's denial of the University's summary judgment motion was based solely on the existence of undetermined factual issues pertaining to the contract claim. The lower court did not address the issue of whether the statements contained defamatory content in its summary judgment ruling. The University reasserted the issue of defamatory content in moving for a directed verdict at both the close of plaintiff's case in chief and at the close of defendant's case. While the trial court denied the University's motion for directed verdict on the defamation claim at the close of plaintiff's case in chief, it did not address the issue head-on, stating: "I really question whether this rises to the level of defamation" and "I don't think it's likely I'm going to leave the defamation action in there because I didn't see where it was being published...." When the motion was renewed at the close of the University's case, the trial court observed:

> [O]n the defamation claim although I must say it's, at best, a very weak defamation case. I think it's unlikely a jury will find defamation of character, to be honest with you, but I'm going to let them take a stab at it. I might even, on review, decide that it might even have been privileged, the way it was presented in this courtroom; but I'm going to still let the jury have it on that grounds because I want the plaintiff to have his day in court and I think he'll have his day in court and I think the jury will say that there's no defamation.

Our review of the record reveals that while the University certainly raised the issue of the lack of defamatory content, the trial court failed to make a ruling on this issue. Not only is Appellee's representation that the trial court ruled in his favor on the issue of defamatory content incorrect, the trial court's statements, as quoted above, suggest an inclination towards a ruling that the statements were devoid of defamatory content.

■ Defining what constitutes defamation in *Crump*, we borrowed language from the Second Restatement of Torts: "A statement may be described as defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" 173 W.Va. at 706, 320 S.E.2d at 77 (quoting Restatement (Second) of Torts § 559 (1977)). We also referred to our earlier recognition in syllabus point one of *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, cert. denied, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975), that statements are defamatory if they tend to "'reflect shame, contumely, and disgrace upon [the plaintiff].'" 173 W.Va. at 706, 320 S.E.2d at 77. It is axiomatic that truth is an absolute defense to an allegation of defamation. *See Crump, id.* at 708, 320 S.E.2d at 79.

■ The University argues that the five statements of Dean Sasser at issue constitute either criticism of Mr. Hupp's behavior that failed to injure him in his professional capacity or opinions regarding his work performance. In either case, the University argues that the statements are not actionable for failure to constitute defamation. In *Maynard v. Daily Gazette Co.*, 191 W.Va. 601, 447 S.E.2d 293 (1994), we discussed the United States Supreme Court's decision of *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), stating:

the Court refused to recognize "still another First Amendment-based protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.'" *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2705. "Rather than recognize a constitutional distinction between 'fact' and 'opinion,' the Court recognized a constitutional distinction between 'fact' and 'non-fact.' The Court thus changed the terminology of constitutional law in *Milkovich*, but not the underlying substance." Rodney A. Smolla, *Law of Defamation* § 6.02[1] (1994).

191 W.Va. at 603–04, 447 S.E.2d at 295–96. This Court in *Maynard* continued its discussion of the *Milkovich* decision, noting that

the [United States Supreme] Court['s] ... decision in [*Philadelphia Newspapers, Inc. v.] Hepps* [475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)] "stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law.... *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 19–20, 110 S.Ct. at 2706.

191 W.Va. at 604, 447 S.E.2d at 296. Adopting the principles stated in *Milkovich*,[7] we held in syllabus point four of *Maynard* that "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." *Id.* at 602, 447 S.E.2d at 294.

 Against these principles, we examine the five statements at issue in this case to see whether they constitute true statements, which are unactionable, or whether they constitute statements of opinion that do not contain provably false assertions of fact and are

entitled to constitutional protection. The first statement involves Dean Sasser's comment to a university professor that there were numerous complaints against Mr. Hupp for his alleged abusiveness and unprofessional behavior. This statement is either true or false. Either there were numerous complaints regarding Mr. Hupp or there weren't. Dean Sasser testified[8] at trial as to his receipt of multiple complaints regarding Mr. Hupp's behavior:

Q. Did there come a time, Dean Sasser, where you began to hear complaints about Mr. Hupp's behavior?

A. Yes.

Q. When was that?

A. I think in March of that semester...

Q. And who was bringing these complaints to you then?

A. I think the first I heard were from staff members who said students were coming to them with complaints; and my response was tell those students they ought to come see me if they have complaints.

 . . . .

Q. And did there come a time when you began to hear complaints directly from students?

A. Yes.

Q. And when was that?

A. I think in early April, students came to see me.

Q. How many students came to see you, Dean Sasser?

A. Three or four in April.

Q. Do you recall their names?

A. Karen Janisweski; Mr. Korman, Andrew Korman, I believe; a graduate student named Chuck Scatterday and Mark Auber.

7. With regard to the laws of defamation as they affect private individuals, the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), stated "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010.

8. In addition to Dean Sasser's testimony, Mr. Hupp introduced a memorandum dated April 20, 1992, from Dean Sasser to Dr. William E. Vehse, the Provost and Vice President for Academic Affairs and Research, that describes in detail the nature of the complaints he was receiving about Mr. Hupp.

Q. Can you tell the jury the nature of the complaints you were receiving about Mr. Hupp's behavior?

A. Well, they were that he used bad language, that is, profane language sometime, abusive, and they thought he was abusive. A couple of them said they were afraid of him. At least one of them said they wouldn't return as a student in the fall if he was still the graduate student. . . .

Q. Did they tell you any of the profane language that he was using?

A. Yes.

Q. And I'm not going to ask you to repeat it but would that include what we comically call the "f" word almost?

A. Yes.

Q. Did there come a time when Susan Bohna told you that she was receiving complaints from students?

A. Yes. About the same time.

Q. Same kind of complaints?

A. Yes.

Q. How about Dr. Tom Sloane . . . ?

A. Yes. I had a telephone call from Dr. Sloane in mid April, I believe, and he was reporting to me that one of our undergraduate female majors had come to see him and he thought he needed to share it with me because he thought it might constitute sexual harassment. . . .

■ Defamation law requires that you consider the alleged defamatory words in the context in which they were made. *See Goldberg v. Coldwell Banker, Inc.,* 159 A.D.2d 684, 553 N.Y.S.2d 432, 433 (N.Y.App. Div.1990); *see also Long,* 176 W.Va. at 637, 346 S.E.2d at 787. Thus, Dean Sasser cannot be viewed as having described Mr. Hupp as "abusive" or "unprofessional," but only to have made a statement regarding the registering of multiple complaints in which he characterized the nature of those complaints concerning Mr. Hupp's behavior as abusive or unprofessional. Since the record demonstrates that these complaints were in fact made and not fictional in nature and because Dean Sasser's testimony regarding their substance bears out his depiction of the complaints, we find this first statement to be outside the realm of defamation law on

grounds of truth. *See Crump,* 173 W.Va. at 708, 320 S.E.2d at 79.

■ The second statement involves Dean Sasser's comment to Professor Hinds that "he is a bully. He tried to bully me." This statement falls within the category of protected speech under our holding in *Maynard* that covers opinion devoid of a provably false assertion of fact. *See* 191 W.Va. at 602, 447 S.E.2d at 294, syl. pt. 4. Dean Sasser's opinion that Mr. Hupp is a bully is not probably false as that conclusion is totally subjective. *See Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1289 (4th Cir.1987) (explaining initial test of statement for defamation purposes as requiring conclusion that "truth or falsity of the statement does not depend upon subjective values or indefinite terms"). The threshold of what constitutes bullyism to one would necessarily not be the same for another individual. *See also* Rodney A. Smolla, *Law of Defamation* § 6.12[10] (1996) (noting that "[n]ame calling, epithets, and abusive language, no matter how vulgar or offensive, are not actionable"). This is clearly speech that falls within the ambit of the constitutional protections discussed in *Milkovich. See* 497 U.S. at 19–20, 110 S.Ct. at 2706; *accord Maynard,* 191 W.Va. at 607, 447 S.E.2d at 299.

■ We view the third and fourth statements together as they are similar. In two separate documents, Dean Sasser referenced first Mr. Hupp's unprofessional behavior and second, his unacceptable behavior. Both of these statements were set forth in memoranda that clearly indicated they originated from Dean Sasser and both of these statements constitute statements of non-fact—subjective conclusions that Dean Sasser had reached regarding Mr. Hupp's behavior. These statements, as was the comment regarding Mr. Hupp being a bully, might not reflect the same conclusion that other individuals would reach when considering Mr. Hupp's behavior, but they are clearly not provably false. *See Potomac Valve & Fitting,* 829 F.2d at 1288 (explaining that statements that are "inherently impossible to prove or disprove" are "protected by the First Amendment"). Accordingly, they are protected under syllabus

point four of *Maynard.* 191 W.Va. at 602, 447 S.E.2d at 294.

██ The final statement is arguably without any defamatory content on its face. This statement was contained in a letter that postdates the filing of this civil action and concerned the lack of Mr. Hupp's authorization to use school-owned equipment. This is clearly a statement that can be proven as true with regard to Mr. Hupp's lack of authority to use school equipment following his non-renewal as a graduate assistant. Of all the statements at issue, this one lacks even a hint of defamatory content.

Having reviewed the statements at issue, we cannot reach the conclusion that any of the statements qualify as containing the requisite defamatory content that would have permitted this issue to go to the jury. *See Sandler v. Marconi Circuit Technology Corp.,* 814 F.Supp. 263, 268 (E.D.N.Y.1993) (holding that statement that plaintiff "screwed up the company and we had to let [him] go" was expression of opinion of dissatisfaction with plaintiff's professional performance and not actionable defamation); *McDowell v. Dart,* 201 A.D.2d 895, 607 N.Y.S.2d 755 (1994) (holding that allegedly defamatory statements made by employer regarding employee's work performance constituted opinions and thus were not actionable); *Goldberg,* 553 N.Y.S.2d at 433 (ruling that statements in interoffice memorandum charging that attorney "has been most uncooperative, abrasive and dilatory in fulfilling his responsibilities in interacting with our customer [sic], client's attorney, client and participating brokers" and further recommending that attorney not be retained in future were expressions of opinion regarding manner in which individual conducted himself and not actionable); *Dong v. Board of Trustees,* 191 Cal.App.3d 1572, 236 Cal.Rptr. 912, 921 (1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 680 (1988) (finding letter from medical school professor that criticized colleague's unethical research practices to be statement of opinion and not actionable).

9. *See infra* note 19.

Having determined that the statements at issue do not qualify as defamatory under the law, we conclude that the initial showing necessary for a defamation proceeding was never made in this case. *See Long,* 176 W.Va. at 636, 346 S.E.2d at 787. We further conclude that the lower court erred in failing to rule in the University's favor on the issue of defamation based on lack of defamatory content. Based on our ruling on lack of defamatory content, we find it unnecessary to address the issues of whether the statements were privileged or published outside the University.

## II. BREACH OF CONTRACT

It is undisputed that no written contract of employment exists, and the record is somewhat unclear regarding the nature of the contract that Mr. Hupp claims was breached. Whereas the second amended complaint describes the contract as stemming from an oral representation made by Dean Sasser to Mr. Hupp that his graduate assistantship would be renewed for the academic year 1982–83, the trial transcript reflects that Mr. Hupp argued that an implied contract existed based on the past practice of the University to permit graduate assistants to retain their teaching positions until they attained their graduate degrees. As discussed within section III. of this opinion, because there were certain conditions to the continuation of such a contract even if such an implied contract was in effect, the issue of Mr. Hupp being entitled to a contract of continued employment as a graduate assistant at the University was certainly disputed. Those conditions, as testified to by Mr. Hupp's own witnesses,[9] were that in addition to maintaining a grade point average of at least 3.0, graduate assistants had to perform the requirements of their teaching position in a satisfactory manner to be permitted to remain in such positions.

██ Although this Court finds the evidence on the contract claim to be extremely weak, the University does not raise any assignments of error with regard to this is-

sue.[10] In fact, during oral argument, the University stated "we believe the evidence does support the breach of contract claim." Had the University properly raised this issue by making it the subject of an assignment of error, it appears they would have prevailed in a reversal from this Court. It is difficult to understand why the University chose to waive this issue, as it is hornbook law that even if a contract exists, one claiming rights thereunder must be able to demonstrate that they performed their responsibilities thereunder.[11] Clearly, one holding a position such as Mr. Hupp's cannot be said to have performed his professional obligations satisfactorily in view of the evidence regarding the abusive manner in which he treated students and co-workers. However, as we stated in syllabus point three of *Sulzberger & Sons Co. v. Fairmont Packing Co.*, 86 W.Va. 361, 103 S.E. 121 (1920), "[t]his court will not review or reverse a decree or order of the circuit court, or any part thereof, not appealed from." Based on the University's decision not to appeal on this issue, we are left with no choice but to uphold the verdict on the contract claim.

## III. DUE PROCESS

The University argues that Mr. Hupp had no constitutionally protected interest in being reappointed to a graduate assistantship and thus was not entitled to due process protections in connection with his claim predicated on the University's failure to renew his assistantship position under the same terms as the other graduate assistants. With regard to the due process concerns arising in connection with the allegations of Mr. Hupp's unprofessional behavior, the University contends that he received the requisite due process by virtue of the meeting with Dean Sasser and Jon Reed on April 21, 1992.[12]

■ This Court recognized in *Clarke v. West Virginia Board of Regents*, 166 W.Va. 702, 279 S.E.2d 169 (1981), that "[t]he threshold question in any inquiry into a claim that an individual has been denied procedural due process is whether the interest asserted by the individual rises to the level of a 'property' or 'liberty' interest protected by Article III, Section 10 of our constitution." *Id.* at 709, 279 S.E.2d at 175 (citing *Waite v. Civil Service Comm'n*, 161 W.Va. 154, 241 S.E.2d 164 (1977)). "[F]or a protected 'property interest' to arise, there must be rules, understandings, or relationships between the employee and the institution which give rise to a legitimate claim of entitlement." *West Virginia University v. Sauvageot*, 185 W.Va. 534, 537, 408 S.E.2d 286, 289 (1991). We defined a protected property interest in syllabus point three of *Waite*, stating that "A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." 161 W.Va. at 154, 241 S.E.2d at 165. Although Mr. Hupp was clearly not under written contract with the University in connection with his graduate assistantship, we explained in *Sauvageot*, that while "[t]here must be some undertaking, or position by the employer which gives rise to an objective expectation on the part of the employee[,]" this "undertaking, however, does not have to be in writing; it may evolve in a *de facto* fashion." 185 W.Va. at 537, 408 S.E.2d at 289.

■ Mr. Hupp argued below that, because it was the practice of the University to continue graduate assistantship positions from semester to semester until they completed their degrees barring a grade point average that fell below 3.0, he had an expectation that his position would be continued in similar fashion, as he remained in good academic standing. With regard to the due process protections due him, Mr. Hupp intro-

---

10. The petition for appeal and the University's appellate brief mention the contract claim only insofar as it relates to the claim of denial of due process. Although the University did raise in post-trial motions the sufficiency of the evidence to support the jury verdict on the contract claim, no assignment of error was raised with this Court that pertains to the contract claim.

11. *See* 4B Michie's Jurisprudence, Contracts § 58 (1986).

12. We do not reach this secondary issue of due process based on our conclusion that Mr. Hupp did not have a protected property interest in continued employment as a graduate assistant.

duced evidence that defined graduate assistants as members of the faculty [13] and maintained that as such a faculty member he was entitled to utilize the grievance system in place for University faculty.[14] In fact, Mr. Hupp wrote to the vice president of academic affairs, Dr. Russell Dean, on August 31, 1992, that he wished to file a grievance [15] in connection with the decision not to extend his assistantship position.[16] Although Mr. Hupp represents on appeal that Dean Sasser responded to this request by informing him that he was not entitled to utilize the grievance procedures, the document that he cites as support for this response is dated three months earlier. That memorandum, dated May 21, 1992, indicates that "[b]ecause you are no longer an employee, I do not believe you are eligible to use the employee grievance systems[,]" but continues, "[i]f you are eligible, and you are attempting to file a grievance, you have not properly identified which grievance system you are trying to use." [17]

The possibility of a property interest arising in a university setting based on the expectation of reemployment has clearly been recognized. *See Siu v. Johnson,* 748 F.2d 238, 244 (4th Cir.1984) (discussing, but rejecting, concept of property interest arising from "the University's procedures and their application over time ... giv[ing] rise to an institutional 'common law of re-employment' under which the interest created by her probationary appointment had been elevated to something firmer than a mere 'unilateral expectation'") (quoting *Board of Regents v. Roth,* 408 U.S. 564, 578 n. 16, 92 S.Ct. 2701, 2710 n. 16, 33 L.Ed.2d 548 (1972)). In *Sauvageot,* we found that a teacher continuously rehired for almost fourteen years under one-year contracts "had a reasonable objective expectation that her employment would continue" "because of the University's long-term and repeated practice of reappointing ... [her] as her annual contracts expired." 185 W.Va. at 538, 408 S.E.2d at 290.

The question to be resolved then is whether Mr. Hupp had a "reasonable objective expectation that [his] employment would continue." *Id.* Mr. Hupp acknowledged through his testimony that at the time of his meeting with Dean Sasser and Jon Reed in April 1992, there was "certainly [a] threat that my assistantship would certainly be under very serious scrutiny and review." The University relies on this testimony to argue that Mr. Hupp knew his reappointment was uncertain at best. Also introduced at trial was a memorandum from Dean Sasser to Mr. Hupp dated May 15, 1992, which indicated that the issue of whether he would be offered the teaching position for the Fall semester would probably not be resolved until later that summer.[18] This lends further support to the issue that Mr. Hupp was placed on notice as to the possibility of non-renewal.

As we stated in *Sauvageot,* "unilateral, subjective expectations on the part of an employee developed apart from any action,

---

**13.** Rule 3.7.3 of "Title 128, Procedural Rules, University System of West Virginia, Board of Trustees, Series 36," which pertains to "Academic Freedom, Promotion, and Tenure," a document introduced by Mr. Hupp at trial, designates graduate assistants as temporary faculty members.

**14.** The faculty grievance procedures established by the University provide for a four level process that begins at the department level, and if necessary, ultimately proceeds to the University president.

**15.** In that document, Mr. Hupp indicated that he "wish[ed] to file such formal charges and/or grievances as may be appropriate and available at this time."

**16.** The record, however, does not indicate whether in fact an actual grievance was filed by Mr. Hupp.

**17.** That document continued: "Therefore, it is difficult to advise you as to any right you may have to appeal. I would refer to Policy Bulletin No. 36 and to West Virginia Code 18–29 as to your appeal rights. Under the statutory scheme you have five days to appeal this decision to the President."

**18.** The memorandum stated that Dean Sasser would give the "matter further consideration" following his receipt of an evaluation of Mr. Hupp's summer work and consultation with senior faculty members. In fact, Mr. Hupp was offered the position as a graduate assistant, but refused to accept the position under the conditions of the offer, which merely required him to "give particular attention and effort toward maintaining appropriate and professional behavior and attitude in the performance of your duties and in your dealings with others during the assistantship."

undertaking, or position of the employer are not sufficient to give rise to a protected property interest." *Id.* at 537, 408 S.E.2d at 289. Clearly, the nature of the complaints registered against him would have brought into issue the viability of his continuation in the graduate assistantship position. And in fact, Mr. Hupp's own testimony established that he recognized the possibility that his teaching position was in jeopardy of not being renewed as a result of the complaints. Because a part of the understanding which surrounded the semester to semester continuation of graduate assistantships included academic good standing, we think it only stands to reason that an assistantship could also be terminated for reasons involving an assistant's professional behavior. In fact, four of Mr. Hupp's witnesses at trial [19] testified that in addition to grades and performing your job, there was a minimum level of behavior that was required and absent that level of behavior you would not be reappointed. Were it not so, the University's hands would be figuratively tied to continue in its employ assistants who were not fit to be in the classroom. Thus, any objective expectation on the part of Mr. Hupp had to include that he continue to be in academic good standing, both grade-wise and teaching performance-wise.

Under the facts of this case, we cannot find that Mr. Hupp had an objective expectation of continued employment and thus, a constitutionally protected property interest in being reappointed to a graduate assistantship did not arise. Accordingly, he was not entitled to due process protections in connection with his terminable position. *See Woods v. Milner,* 760 F.Supp. 623, 643 (E.D.Mich. 1991), *aff'd,* 955 F.2d 436 (6th Cir.1992) (holding that temporary terminable-at-will employee lacked legitimate claim of entitlement necessary for constitutional due process cause of action based on lack of "objective basis for believing that [sh]e w[ould] be employed indefinitely") (quoting *Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988)); *see also Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (reversing appellate court's finding of substantive due process violation and holding that "narrow avenue for judicial review of the substance of academic decisions precludes any conclusion that such decision [not to permit medical student, who had completed four of six-year program, second opportunity to pass examination] was such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment"). Given the lack of a constitutionally protected property interest in continued employment as a graduate assistant, the lower court erred in failing to direct a verdict in the University's favor on this claim.

For the foregoing reasons, the decision of the Circuit Court of Monongalia County is reversed as to its failure to direct a verdict on the issues of defamation and due process, but affirmed on the breach of contract claim based on the University's failure to raise this issue on appeal.

Reversed, in part;

Affirmed, in part.

STARCHER, J., deeming himself disqualified, did not participate in the decision of the Court.

---

19. Those witnesses were Dr. Boyer, Dr. Schreiber, Professor Schie, and Dr. Seymour.