PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1473

LISA MARIE KERR,

Plaintiff – Appellant,

v.

MARSHALL UNIVERSITY BOARD OF GOVERNORS; GENE BRETT KUHN;
JUDITH SOUTHARD; SANDRA BAILEY; TERESA EAGLE; LISA HEATON,
and; DAVID PITTENGER,

Defendants - Appellees.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston. Thomas E. Johnston,
District Judge. (2:14-cv-12333)

Argued: March 22, 2016                    Decided: May 24, 2016

Before GREGORY and DUNCAN, Circuit Judges, and Richard L.
VOORHEES, United States District Judge for the Western District
of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion,
in which Judge Gregory and Judge Voorhees joined.

**ARGUED**: Lisa Marie Kerr, Charleston, West Virginia, Appellant
Pro Se. Andrew Patrick Ballard, ANSPACH MEEKS ELLENBERGER LLP,
Huntington, West Virginia, for Appellees. **ON BRIEF**: John A.
Hess, ANSPACH MEEKS ELLENBERGER LLP, Huntington, West Virginia,
for Appellees.

DUNCAN, Circuit Judge:

Lisa Kerr appeals the district court's order granting Appellees' motion to dismiss her civil action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Because we conclude that the district court properly determined both that sovereign immunity bars Kerr's claims against the Marshall University Board of Governors ("MUBG"), and that the allegations in Kerr's pro se complaint against the other Appellees fail to state a claim upon which relief can be granted, we affirm.

I.

A.

After practicing law for more than fifteen years, Kerr enrolled in Marshall University's Master of Arts in Teaching ("MAT") program to obtain a West Virginia teaching license. A student-teaching practicum, EDF 677, is a required component of the MAT program.

In the fall of 2013, Kerr was a student in EDF 677. A few weeks before the end of the semester, however, Kerr left her student-teaching post in protest over differences with her supervising teacher. Kerr was unable to resolve these differences with the Marshall administration and did not return to her student-teaching post. She was not awarded credit for

2

EDF 677, and she received neither her MAT nor her teaching license.

On March 14, 2014, after unsuccessfully pursuing reconsideration through Marshall's internal grade-appeals process, Kerr filed a complaint in the Southern District of West Virginia. The complaint named as defendants MUBG; Gene Kuhn, Kerr's supervising teacher in EDF 677; Judith Southard, Kerr's Marshall supervisor for EDF 677; Sandra Bailey, the EDF 677 Program Coordinator at Marshall; Teresa Eagle and Lisa Heaton, both Deans of Marshall's College of Education; and David Pittenger, the Dean of Marshall's Graduate Studies (collectively, "Appellees").

B.

We set forth the relevant facts as alleged in Kerr's complaint. See Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 364-65 (4th Cir. 2012). To provide context to Kerr's allegations, we also draw on the Marshall University MAT and Post Bac Programs Student Teacher Handbook (the "Student-Teacher Handbook" or "Handbook"), on which Kerr's complaint relies and which is integral to her complaint.[1]

---

[1] In ruling on a motion to dismiss for failure to state a claim, courts may rely on evidence that is extraneous to the complaint without converting the motion to one for summary judgment--provided that the evidence's authenticity is not challenged and the evidence is "integral to and explicitly (Continued)

1.

EDF 677, the "culminating clinical experience for MAT students," requires "all day student teaching under direct supervision in a public school setting." E.R. 99.[2] The Marshall Student-Teacher Handbook contains regulations by which participants must abide. Participants must also follow "any additional directives given by the [Marshall supervisor]," E.R. 106, who serves as the student teacher's "primary Marshall contact" for any student-teaching issues, E.R. 12. Over the course of the semester, student teachers are expected to collaborate with their supervising classroom teachers and Marshall supervisors to improve their lesson planning, lesson presentation, and classroom management.

As the above arrangement suggests, the student teacher does not have exclusive control of the classroom. For example, the student teacher is not solely responsible for determining grades, and the supervising classroom teacher retains ultimate responsibility "to the school administration, the school board,

relied on in the complaint." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (citation omitted). Kerr has not challenged the authenticity of the Handbook.

[2] Citations to the "E.R." refer to the electronic record compiled by the district court. The joint appendix filed by Kerr in this case is incomplete, and we therefore rely on the electronic record for factual citations.

4

and the parents for promoting the best interests of their students." E.R. 114.

EDF 677 participants receive a grade of "Credit" or "No Credit" based in part on an "Evaluation of Classroom Performance" by the student's supervising classroom teacher and Marshall supervisor, which becomes "a permanent part of the student teacher's record." E.R. 100.[3] "Students must receive a score of at least 'Basic' on all competencies to receive credit for the course." Id.

The Handbook prescribes the attendance policy: "Students are required to be present every day," but are allowed one to three absences for documented illnesses. E.R. 116. "If absences total more than three days, students will be required to complete an extended experience or return in a subsequent semester" to complete the missed time. Id.

2.

Kerr's teaching experience deteriorated over the course of the Fall 2013 Semester. Although the specific events of which she complains began in November, Kerr also makes general references to a lack of support on the Marshall side throughout the semester.

---

[3] There are two other components for course credit, but Kerr's complaint contains no allegations with respect to them.

5

On the Marshall side, during the Fall 2013 Semester, Bailey was Marshall's EDF 677 Coordinator, and Southard was the Marshall supervisor for students enrolled in EDF 677. The complaint alleges that at the beginning of the semester, on or around August 2013, Bailey and Southard learned that Kerr is homosexual. Kerr claims that "each time [she] requested academic or professional support" during the Fall 2013 Semester, she was "stonewalled" by Bailey and Southard. E.R. 12. Southard "routinely ignored" Kerr's emails, and the two Marshall University employees gave "antagonistic, perfunctory, dismissive and even dishonest" responses to Kerr's "reasonable requests for advice." Id.[4]

On the classroom side, Kerr's complaint focuses on her relationship with her supervising classroom teacher, Kuhn. The gist of Kerr's complaint is that Kuhn did not support her authority with the students. For example, according to Kerr, students commented to her, "we don't have to do the work you give us. Mr. Kuhn's going to give us a good grade anyway." E.R. 13. When Kerr approached Kuhn with her concerns, he responded with "silence or cursory brush-offs." Id. Kerr

---

[4] The complaint does not identify any specific instances of Kerr's attempts to contact Bailey or Southard prior to November 19, 2013, and it does not detail any of the Marshall employees' responses to any of Kerr's possible requests for support.

claims that she did not notify Southard or Bailey of the student comments or the resistance to her teaching because she had "received no meaningful support from defendants Southard or Bailey in response to prior requests." Id. Despite these issues, Kerr received positive student-teaching evaluations until November 2013.

On November 19, 2013, however, Kerr discovered the grades Kuhn had entered into the online grade book. In Kerr's view, Kuhn had inflated the grades to such an extent as to amount "to a 'free pass' not to do the work Ms. Kerr assigned." Id. At this point, Kerr decided to report her concerns to her Marshall supervisor.

Kerr sent an email to Southard and Kuhn, "advis[ing]" the two that (1) Kuhn's "conduct had seriously undermined the professional relationship"; (2) "in the exercise of her best professional judgment, [Kerr] would suspend further interaction with [Kuhn] pending follow-up from Marshall"; and (3) she understood that "she had fully satisfied the requirements for student teaching." Id. At that point, neither Kuhn nor Southard had completed Kerr's Evaluation of Classroom Performance. The next day, Bailey--in her capacity as EDF 677 Coordinator--responded to the message and a meeting was set for December 5, 2013.

7

At the December 5, 2013, meeting, Kerr met with Bailey and Eagle, a Dean of Marshall University's College of Education. Bailey and Eagle informed Kerr "that she would be denied academic credit for her student teaching experience, would not receive her master's degree, and would not be recommended for teacher certification." E.R. 14. During the meeting, Bailey read allegations against Kerr from "statements provided by Mr. Kuhn and Ms. Southard," of which Kerr complains she had no prior knowledge. Id. Kerr was handed documents that included Kuhn's evaluation, which Kerr read and attempted to dispute, but she was told that the statements were "dispositive" against her. Id. According to Kerr, she was notified that "her only opportunity to be heard would occur during 'the appeal process.'" E.R. 16. Kerr sought to persuade the Marshall administration to reconsider its decision, but, on December 15, 2013, the grade was "entered into [Kerr's] permanent academic record." Id.

### 3.

Marshall provides an internal, three-step appeals process to MAT students who are dissatisfied with a given grade. The grade is reviewed first by course staff, then by the Deans of the College of Education, and finally by the Dean of Graduate Studies. Kerr submitted a 24-page appeal statement with supporting exhibits at the first stage of her appeal, before

8

Appellees Southard and Bailey. They upheld the denial of credit, and Kerr moved to the second step.

Appellees Eagle and Heaton, both Deans of Marshall's College of Education, decided the second step of Kerr's appeal. The complaint alleges that, in refusing to change Kerr's grade of "No Credit," Eagle and Heaton relied on "new false statements plainly contradicted by Marshall's own records" and failed to address the evidence and arguments Kerr had presented. E.R. 18.[5]

Appellee Pittenger, the Dean of Graduate Studies at Marshall, heard Kerr's final appeal. Kerr submitted an additional appeal statement that included 20 exhibits. Pittenger nevertheless upheld Kerr's grade of "No Credit," stating that Kerr had raised her complaints about Kuhn too late in the semester for Marshall to address them in the manner Kerr desired.

## C.

On March 14, 2014, Kerr filed a complaint in the United States District Court for the Southern District of West Virginia. The complaint raises seven claims: (1) defamation against Appellees MUBG, Kuhn, Southard, and Bailey; (2) tortious interference with a business expectancy against Appellees MUBG, Kuhn, Southard, Bailey, and Eagle; (3) the tort of outrage

---

[5] The complaint does not allege the contents of the "new false statements."

9

against Appellees MUBG, Kuhn, Southard, Bailey, and Eagle; (4) a violation of Kerr's due process rights under 42 U.S.C. § 1983 against Appellees MUBG, Southard, Bailey, and Eagle; (5) a violation of Kerr's equal protection rights pursuant to § 1983, on the basis of Kerr's sexual orientation, against Appellees MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger; (6) a violation of Kerr's equal protection rights under § 1983, as a "class of one," against Appellees MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger; and (7) a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, against Appellees MUBG and Kuhn. Kerr seeks compensatory damages against MUBG and the individual Appellees and injunctive relief against MUBG.

Appellees moved to dismiss Kerr's action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court referred the motion to a magistrate judge for the submission of proposed findings and recommendations ("PF&R") pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge reviewed the complaint and the parties' memoranda of law and recommended that the district court grant Appellees' motion to dismiss in its entirety. See Kerr v. Marshall Univ. Bd. of Governors, No. 2:14-CV-12333, 2015 WL 1405540, at *30 (S.D.W. Va. Feb. 4, 2015) ("Magistrate Judge's Report"). Kerr objected to all but one of the magistrate judge's proposed findings and to all of the magistrate judge's recommendations. The district

10

court, reviewing the PF&R in light of those objections, granted Appellees' motion to dismiss. Kerr v. Marshall Univ. Bd. of Governors, No. 2:14-CV-12333, 2015 WL 1405537, at *26 (S.D.W. Va. Mar. 26, 2015) ("District Court Opinion"). This appeal followed.

II.

On appeal, Kerr argues that the district court erred in granting Appellees' motion to dismiss. Kerr claims that the district court erred by submitting her claim to a magistrate judge for PF&R, that MUBG was not entitled to sovereign immunity, and that her complaint plausibly alleged each of her seven claims. After setting out the relevant standard of review, we address each of Kerr's arguments in turn.

A.

We review de novo a district court's application of sovereign immunity, S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 332 (4th Cir. 2008), and dismissal for failure to state a claim, Clatterbuck, 708 F.3d at 554.

In our review of a 12(b)(6) dismissal, we accept as true the factual allegations set forth in the complaint. Wag More Dogs, LLC v. Cozart, 680 F.3d at 364–65. In order to state a claim, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). A

11

complaint must therefore allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570. In reviewing the motion, "we are not bound by the legal conclusions drawn in the complaint." Adcock v. Freightliner LLC, 550 F.3d 369, 374 (4th Cir. 2008) (citing Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085–86 (4th Cir. 1979)).

We are mindful of our obligation to liberally construe a pro se complaint. See Jehovah v. Clarke, 798 F.3d 169, 176 (4th Cir. 2015) (citing Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014)). Although this court has not determined whether a pro se plaintiff who is also an attorney receives the benefit of this liberal construction, we need not decide that issue here: Kerr's complaint fails whether or not it is liberally construed. We note that Kerr's arguments are not always a model of clarity. Out of an abundance of caution, on these facts, and in accordance with the liberal construction we afford a pro se complainant, we construe Kerr's arguments as best we can given the thrust of her appeal.

B.

We first consider Kerr's argument that "[t]he District Court erred in giving the Complaint short shrift because Plaintiff is acting pro se," Appellant's Br. at 17, and applied

12

an "inverse-*Iqbal*" standard, id. at 15.[6]  Kerr seems particularly troubled by the fact that her civil action was referred to a magistrate judge pursuant to the district court's standing order, claiming that there is "zero authority . . . for subjecting non-post-conviction actions to pre-screening."  See id. at 18.  We hold that the district court demonstrably did not give Kerr's complaint "short shrift."

First, as the PF&R indicates, the district court assigned Kerr's complaint to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B).  Magistrate Judge's Report at *1. Section 636(b) permits a district court to assign any pretrial matter to a magistrate judge.[7]  Kerr is correct that two of the three categories of matters that may be referred to a magistrate

---

[6] As part of Kerr's "inverse-*Iqbal*" argument, she claims the district court made "trial-like determinations (with no evidence!) of whether [Appellees] actually committed each tort alleged, rather than confining itself to evaluation of the Complaint's allegations for pleading sufficiency."  Appellant's Br. at 17.  In doing so, Kerr asserts that the district court found various facts that are contradicted by Kerr's complaint. We construe this part of Kerr's argument to be a substantive challenge to the dismissal of the claims related to each contested fact.  We address those arguments below.

[7] For non-dispositive motions--the resolution of which could not result in the end of the lawsuit--a district court may direct the magistrate judge to make a final ruling on the matter.  See 28 U.S.C. § 636(b)(1)(A).  For dispositive motions, however, a magistrate judge may only render a final decision with the parties' consent.  See id. § 636(c)(1).  But even without the parties' consent, the district court may refer a dispositive matter--like a motion to dismiss--to a magistrate judge for PF&R.  Id. § 636(b)(1)(B).

13

judge for PF&R pursuant to § 636(b)(1)(B) relate to prisoner litigation. But she is incorrect that this means the district court lacked the authority to refer her matter to a magistrate judge or that the magistrate judge somehow treated her action analogously to prisoner litigation.

Moreover, the district court accurately stated and applied the proper standard of review of the magistrate judge's PF&R. In its memorandum opinion and order dismissing Kerr's complaint, the district court reviewed de novo each of the magistrate judge's findings and recommendations to which Kerr objected. See 28 U.S.C. § 636(b)(1)(C).[8] In doing so, the district court also considered the fact that Kerr was a pro se plaintiff and afforded her pleadings a liberal construction. District Court Opinion at *5 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976); Loe v. Armistead, 582 F.2d 1291, 1295 (4th Cir. 1978)).

Contrary to Kerr's argument, the district court did not merely "adopt the bulk of the Magistrate's Proposed Findings and Recommendation." See Appellant's Br. at 18. Rather, the district court conducted an exhaustive review of the magistrate judge's PF&R. In fact, the district court's reasoning

---

[8] As Kerr objected to all but one of the magistrate judge's proposed findings and to all of the magistrate judge's recommendations, the district court engaged essentially in a de novo review.

14

substantively differs from the PF&R with respect to a number of Kerr's claims.[9] We hold that the district court properly referred Appellees' motion to dismiss to a magistrate judge, and the referral and review process did not prejudice Kerr in any way.

C.

Next, we address Kerr's argument that the district court erred in dismissing all claims against MUBG on sovereign immunity grounds.[10] In doing so, the district court found MUBG to be an "arm of the state" for purposes of sovereign immunity and held that no exception to state sovereign immunity applied. District Court Opinion at *9-11. Thus, sovereign immunity barred all claims against MUBG. Id. at 11. Kerr does not contest the district court's finding that MUBG is an "arm of the state." Instead, Kerr argues that her claims fall into an exception to sovereign immunity because the "[j]udicially

_____

[9] Compare, e.g., District Court Opinion at *26 (holding Kerr did not sufficiently allege Kuhn is an "employer" under FLSA), with Magistrate Judge's Report at *30 (recommending that the district court dismiss the FLSA claim because "section 213(a)(1) of the FLSA specifically excludes a 'teacher in elementary or secondary schools' from the minimum wage and maximum hour requirements").

[10] Kerr did not seek injunctive relief against any Appellee except for MUBG. Thus, in dismissing all claims against MUBG, the district court dismissed all of Kerr's claims for injunctive relief.

15

implied 'anti-gay exceptions' to Title IX cannot survive Obergefell and Bostic." Appellant's Br. at 27.

Kerr alleges that her equal protection rights were violated on the basis of her sexual orientation. We need not reach the merits of the argument, however, because as Kerr acknowledges, her complaint makes no mention of Title IX as a basis for liability or relief, or as an exception to sovereign immunity. See Appellant's Br. at 28. We agree with the district court that, "[w]hile the Court liberally construes Plaintiff's claims, it will not fundamentally rewrite the causes of action provided in the Complaint." District Court Opinion at *10. In short, even liberally construed, Kerr's complaint does not present this legal issue.

D.

We turn next to Kerr's argument that the district court erred in its decision to dismiss all of Kerr's claims against the remaining Appellees for failure to state a claim upon which relief could be granted.[11] As we explain below, on the basis of

---

[11] Kerr only explicitly challenges the dismissal of her defamation claim, her § 1983 due process claim, and her two § 1983 equal protection claims. However, Kerr also challenges various findings of fact that relate to her other claims. In light of Kerr's pro se status, we review the dismissal of all seven of her claims for relief.

The "findings of fact" Kerr contests are the following: (1) the statements Kuhn made about Kerr in the evaluation were (Continued)

16

the well-pleaded facts in the complaint and the Handbook on which the complaint relies, we are constrained to disagree.

1.

We begin with Kerr's claim for defamation against Appellees MUBG, Kuhn, Southard, and Bailey. We note that the allegedly defamatory statements, which Kuhn made in connection with his evaluation of Kerr's student teaching, underlie most of Kerr's claims. The district court found that the complaint's "general assertions" that Kuhn's statements included "'false' accusations," without any additional information or context, did not provide any indication that Kuhn's statements were not based on opinion. District Court Opinion at *12. On appeal, Kerr argues that the district court erred in determining that the statements Kuhn made about Kerr in his evaluation of her were "opinions" not capable of defamatory meaning. Appellees contend that the district court properly determined that the statements were not capable of a defamatory meaning, and in the

---

"not false or defamatory"; (2) Kerr had no valid business expectancy sufficient to state a claim for the tort of intentional interference with business expectancy; (3) Appellees did not engage in extreme or outrageous conduct sufficient to state a claim for the tort of outrage; (4) Kerr's "whole action is a trivial dispute over a grade"; (5) the statements Kuhn made about Kerr in the evaluation "constituted genuine academic discretion"; (6) Appellants acted rationally and in good faith; and (7) Kuhn was not an "employer" for purposes of Kerr's FLSA claim. Appellant's Br. at 16.

17

alternative, that the statements were protected by qualified privilege.

As we explain below, we agree with the district court that all of the specific statements were "solely opinion along the lines of the statements found to be non-factual by the Supreme Court of Appeals of West Virginia." Id. (citing Hupp v. Sasser, 490 S.E.2d 880, 887 (W. Va. 1997)). Even if the complaint had alleged statements capable of defamatory meaning, the claim would still fail because the statements alleged are privileged.

i.

Under the familiar Erie doctrine, we apply state substantive law and federal procedural law when reviewing state-law claims. See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n.3 (4th Cir. 2013); Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). A successful claim for defamation under West Virginia law requires proof of "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 5, Belcher v. Wal-Mart Stores, Inc., 568 S.E.2d 19, 22 (W. Va. 2002) (citing Syl. Pt. 1, Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 74 (W. Va. 1983)). In other words,

> to have a defamation claim, a plaintiff must show that false and defamatory statements were made against him, or relating to him, to a third party who did not have a reasonable right to know, and that the statements were made at least negligently on the part of the party making the statements, and resulted in injury to the plaintiff.

Bine v. Owens, 542 S.E.2d 842, 846 (W. Va. 2000).

Whether a statement is capable of a defamatory meaning is a matter of law for the court to decide. Syl. Pt. 6, Belcher, 568 S.E.2d at 22 (citing Syl. Pt. 6, Long v. Egnor, 346 S.E.2d 778, 779 (W. Va. 1986)). As the West Virginia Supreme Court has noted, "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." Syl. Pt. 3, Hupp, 490 S.E.2d at 882 (quoting Syl. Pt. 4, Maynard v. Daily Gazette Co., 447 S.E.2d 293, 294 (W. Va. 1994)). This inquiry is context-specific. Id. at 887.

Kerr's complaint alleges that Kuhn's evaluation contained three types of defamatory language: (1) "[f]alse accusations of dishonest and unethical conduct against Ms. Kerr"; (2) "[d]irect statements by both defendants Kuhn and Southard that Ms. Kerr was unqualified to become a teacher"; and (3) "[e]valuations of Ms. Kerr as 'unsatisfactory' in numerous areas which had

19

previously . . . been evaluated as positive." E.R. 15.[12] Thus, we consider whether, under West Virginia law, statements in an academic evaluation that an individual is "dishonest," "unethical," "unqualified to become a teacher," and "unsatisfactory," are capable of defamatory meaning.

In Hupp v. Sasser, the West Virginia Supreme Court of Appeals considered statements made by the Dean of West Virginia University's School of Journalism that a graduate assistant was "unprofessional" and that the graduate assistant's behavior was "unacceptable." 490 S.E.2d at 884. The West Virginia Supreme Court held that those statements were not capable of defamatory meaning, even if they "might not reflect the same conclusion that other individuals would reach when considering [the plaintiff's] behavior." Id. at 887. Because those statements were "clearly not provably false," they were protected. Id.

Here, statements that Kerr was "unqualified" and performed "unsatisfactory[ily]" are analogous to those the West Virginia

_____

[12] In her complaint, Kerr represents that the alleged statements would "be subsequently provided in full to the Court under seal to avoid unnecessary publication." E.R. 15. Appellees filed the evaluation in a motion to seal, but the district court did not consider the evaluation in ruling on the contemporaneously filed motion to dismiss. The district court determined only whether it could consider the extrinsic evidence appended to the motion to dismiss itself. See District Court Opinion at *8. We need not decide whether it would have been erroneous for the district court to consider the documents appended to the motion to seal without converting the motion to dismiss into a motion for summary judgment.

20

Supreme Court rejected in Hupp.  Although Kerr might disagree with them, Kuhn's statements are "clearly not provably false." See id.  To the extent that the first category of statements expressed Kuhn's judgment that Kerr is "dishonest and unethical," those statements would also be opinions not capable of defamatory meaning under Hupp.

## ii.

Even if the complaint had plausibly alleged that Appellees had made statements capable of defamatory meaning, Appellees' statements would still be protected by qualified privilege.[13] Under West Virginia law, any defamation claim must be based on a "non privileged communication to a third party."  Syl. Pt. 5, Belcher, 568 S.E.2d at 22 (citing Syl. Pt. 1, Crump, 320 S.E.2d at 74).  Like determining whether a statement is capable of defamatory meaning, at least "in the absence of controversy as to the facts," the existence of a qualified privilege is a question of law for the courts.  Syl. Pt. 8, id. (citations omitted).  We evaluate that privilege here on the bases of the facts alleged in Kerr's complaint and the Handbook's policies, and we hold that the statements were protected by qualified privilege.

---

[13] In our review, we may affirm on any grounds supported by the record, notwithstanding the reasoning of the district court. United States v. Moore, 709 F.3d 287, 293 (4th Cir. 2013).

21

The Supreme Court of West Virginia has explained that

> [q]ualified privileges are based upon the public policy that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter; however, a bad motive will defeat a qualified privilege defense.

Syl. Pt. 9, id. at 27 (quoting Syl. Pt. 4, Dzinglski v. Weirton Steel Corp., 445 S.E.2d 219, 221 (W. Va. 1994)). Importantly, the non-existence of qualified privilege is an essential element of a defamation claim under West Virginia law. Thus, in order to state a claim for defamation, a complaint must plausibly allege, among other facts, that Appellees published the statements to individuals who did not have a "legitimate interest" in them.

With respect to publication, Kerr's complaint alleges that Kuhn "communicated [the statements] to defendants Southard, Bailey, and MUBG," and that Southard at least negligently "ratified, adopted and (on information and belief) actively solicited defendant Kuhn's false and defamatory statements . . . and communicated them to defendants MUBG and Bailey." E.R. 19. Further, Kerr contends that Bailey ratified the statement and communicated it to MUBG, which also ratified Kuhn's statements before it "communicated them to Ms. Kerr's prospective employers

22

and other members of the public, as part of Ms. Kerr's permanent academic record."  Id.

Although the complaint accuses Southard, Bailey, and Eagle of "ratifying" Kuhn's statements, the complaint never alleges that the statements were published outside of the Marshall administration, much less "to a third party who did not have a reasonable right to know."  See Belcher, 568 S.E.2d. at 26.[14] The Handbook belies any argument that putting the evaluation in Kerr's permanent academic record constituted publication to a third party without a reasonable right to know.  The evaluations are automatically placed in students' permanent academic records, but students must consent to having their evaluations

_____

[14] Kerr alleges that Bailey "personally and unequivocally ratified" Kuhn's statement when Bailey "confronted Ms. Kerr with false allegations from the Kuhn Statement" and sarcastically asked, "[y]ou cannot seriously expect that we would give you a degree or recommend you for certification when you have done these things?"  E.R. 15-16.  The complaint therefore only alleges that Bailey communicated the statement to Eagle and Kerr, not to a third party without a reasonable right to know.

The complaint alleges that a "ratification" of Kuhn's statements by Southard was included with the papers presented to Kerr at the December 5, 2013 meeting with Bailey and Eagle.  It does not allege that this "ratification" was ever disclosed to a third party outside of the Marshall administration, other than to Kerr.

In her complaint, Kerr alleges that Appellee Eagle "threatened to disclose the Kuhn Statement directly to Ms. Kerr's prospective employers if Ms. Kerr followed up on the appeal."  Id. at 16.  However, the complaint does not allege that Eagle actually disclosed Kuhn's statements to anyone outside of the Marshall administration, other than to Kerr.

23

made available to potential employers. Kerr therefore does not plausibly allege that any third parties without a reasonable right to know had access to her academic record.

Here, the Handbook readily establishes that Kuhn had a duty to review Kerr's integrity, professionalism, and competence in Kerr's student teaching evaluation and that his candor would benefit the public interest. Given that Kerr was pursuing her teaching license, and given Kuhn's position as her supervising classroom teacher, it was "reasonably necessary" to ensure that the middle-school Social Studies students in West Virginia were taught by qualified educators. Thus, the district court did not err in dismissing Kerr's defamation claim.[15]

2.

The district court also dismissed Kerr's second claim--for tortious interference with business expectancy against Appellees MUBG, Kuhn, Southard, Bailey, and Eagle. On appeal, Kerr contends that "the District Court erred by factually finding

---

[15] The fact that the complaint alleges the statements are false does not by itself defeat qualified privilege. See Belcher, 568 S.E.2d. at 27. Indeed, even if the statements were capable of a defamatory meaning, qualified privilege immunizes statements that are later proven to be false, as long as the statements are made in good faith. Id. While a showing of bad faith can defeat a defense of qualified privilege, the statements would still need to be published to a third party without a reasonable right to know in order to be actionable as defamation.

(contrary to the Complaint) that . . . [Kerr] had no valid expectancy of employment." Appellant's Br. at 16. We disagree.

Under West Virginia law, a claim for tortious interference with business expectancy requires proof of four elements: "(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." Syl. Pt. 1, C.W. Dev., Inc. v. Structures, Inc. of W. Virginia, 408 S.E.2d 41, 42 (W. Va. 1991) (quoting Syl. Pt. 2, Torbett v. Wheeling Dollar Sav. & Trust Co., 314 S.E.2d 166, 167 (W. Va. 1983)). While no written contract is required for a claim for tortious interference, the complaint must still allege that the interference caused the harm sustained.

Kerr claims that she "had been invited and encouraged to apply for two teaching positions," that Kerr had applied for one of those positions, and that Kerr "expected to be interviewed as soon as she graduated from Marshall and received her teaching certification." E.R. 20-21. Kerr claims that Kuhn's statements in his evaluation of her performance--which Southard, Bailey, and Eagle included in her permanent academic record--interfered with her expectation that she would be a gainfully employed teacher after receiving her MAT and teacher certification. Because Kerr's expectation of employment was mere speculation,

25

however, she has not plausibly alleged that the interference could have caused the harm sustained.

According to the allegations of the complaint itself, Kerr's supposed business expectancy was but a subjective hope. As the complaint notes, Kerr was still "weeks away" from earning her MAT and teaching license and did not have the ability to gain employment as a teacher at the time the statements were made. The complaint in no way alleges that Kerr had completed the course requirements of EDF 677, let alone all of the requirements to become a teacher, by November 2013, when the conduct at issue occurred. Even accepting Kerr's statement in her November 19, 2013, email that she understood that she had "fully satisfied the requirements for student teaching," E.R. 13, the complaint does not allege that she completed the other requirements for EDF 677 credit.

More to the point, Kerr did not have an existing offer for employment or reasonable expectation with which any of the Appellees could have interfered. She had not been offered an interview for the job to which she applied, and she had not even applied to the other. Accordingly, the district court properly dismissed Kerr's claim for tortious interference.

3.

We turn next to Kerr's contention that the district court erred in dismissing her claim for the tort of outrage--also

26

known as intentional infliction of emotional distress--against Appellees MUBG, Kuhn, Southard, Bailey, and Eagle. The district court held that Kerr failed to state an outrage claim because the conduct alleged did not meet the "outrageous" standard required by West Virginia law. District Court Opinion at *15. Kerr argues on appeal that the district court erred in finding Appellants had not acted outrageously.

Under West Virginia law, the tort of outrage requires proof of four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 421 (W. Va. 1998) "Whether conduct may reasonably be considered outrageous is a legal question," Syl. Pt. 4., id., which courts determine on a "case-by-case basis," Hines v. Hills Dep't Stores, Inc., 454 S.E.2d 385, 390 (W. Va. 1994) (citing Restatement (Second) of Torts § 46).

In order for the "outrageous" standard to be met, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to

27

be regarded as atrocious and utterly intolerable in a civilized community." Harless v. First Nat. Bank in Fairmont, 289 S.E.2d 692, 705 (W. Va. 1982) (quoting Restatement (Second) of Torts § 46, cmt. d.). The conduct must be more than "merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, [] negligent . . . . [or] overzealous." Hines, 454 S.E.2d at 391 (citing Courtney v. Courtney, 413 S.E.2d 418, 423 (W. Va. 1991)).

The complaint alleges that the Appellees engaged in reckless or intentional conduct by "causing [the] false and misleading statements" in Kuhn's evaluation to be included in Kerr's permanent academic record and by "denying or conspiring to deny" Kerr academic credit, her degree, and her teacher certification. E.R. 22. Kerr also claims that Eagle's threat to provide Kuhn's evaluation to potential employers constituted the tort of outrage. We agree with the district court that Appellees' conduct does not rise to the "exacting" standard imposed by West Virginia law. See District Court Opinion at *15 (citation omitted).

While the allegations in the complaint do not depict the Marshall administration as particularly kind or sympathetic in their interactions with Kerr, the complaint does not identify any behavior that was "beyond all possible bounds of decency." Kuhn's unflattering comments notwithstanding, Kerr did fail to

28

complete her student teaching assignment. On these facts, we hold that the district court properly dismissed Kerr's claim of outrage.

4.

Kerr contends that her due process rights were violated by Appellees MUBG, Southard, Bailey, and Eagle when they "depriv[ed] her of protected property interests in academic credit, graduation, certification and prospective employment without notice or opportunity to be heard." E.R. 23.[16] Procedurally, the district court determined that Kerr was given all the process she was due; substantively, the district court "defer[red] to [Appellees'] professional academic judgment," because there was no evidence the decision was arbitrary or capricious. District Court Opinion at *20.[17]

_____

[16] The district court considered Kerr to have raised both a procedural and substantive due process claim, "assum[ing]--without deciding--that [Kerr] has plausibly pled a protected property interest." District Court Opinion at *17 (citation omitted).

[17] In doing so, the district court reasoned that academic evaluations, unlike disciplinary evaluations, are subject to an "arbitrary and capricious" standard and should not be upset unless the decision "did not involve the exercise of professional judgment." Id. at *20 (citation and quotation marks omitted).

In the academic setting, courts have drawn a distinction between disciplinary and academic evaluations, see, e.g., Clark v. Whiting, 607 F.2d 634, 643-44 (4th Cir. 1979), the latter of which requires less procedural protection. This court has noted (Continued)

29

Kerr argues on appeal that the district court erred in "ruling that universities have a Due Process right to establish and withhold procedural protections on a whim." Appellant's Br. at 21. As a preliminary matter, we note that the district court did not make this holding in dismissing Kerr's due process claim. We construe Kerr's argument to be that the district court erred in assuming that Kerr had a property interest in the continuation of academic endeavors and determining that she was nevertheless given all the process that was due. This argument, too, fails.

We do not believe that Kerr alleged even the protected property interest that she argues this court should recognize. Even if there were a protected property interest in "academic credit, graduation, certification and prospective employment," the complaint does not plausibly allege that Kerr had a legitimate claim of entitlement to that property interest, even construed liberally. Even still, Marshall provided ample process through its tripartite appeals process, and the record contains ample justification for Marshall's decision.

---

that "[i]n the context of due-process challenges . . . a court should defer to a school's professional judgement regarding a student's academic or professional qualifications." Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 462 (4th Cir. 2012).

30

In order to state a claim for a violation of due process, "a plaintiff must allege sufficient facts to support a finding that the [plaintiff was] 'deprived of life, liberty, or property, by governmental action.'" Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109 (4th Cir. 2011) (quoting Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997)). The Fourteenth Amendment does not create a property interest itself, rather the property interest "must be created or defined by an independent source." Id. (citations omitted). For a property interest in a certain government benefit, "a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II, 91 F.3d 630, 634 (4th Cir. 1996) (quoting Bd. Of Regents v. Roth, 408 U.S. 564, 577 (1972)).

Both substantive and procedural due process rights are triggered by a legitimate claim of entitlement to a property interest. For procedural due process claims, "the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Zinermon v. Burch, 494 U.S. 113, 125 (1990) (citations and internal quotation marks omitted).

31

Substantive due process claims, however, deal with the reasonableness of the governmental decision. Where executive action is concerned, a violation of an individual's substantive due process rights exists only when the official action is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

Here, Kerr did not have a legitimate claim of entitlement to the property interest of "academic credit, graduation, certification, and prospective employment" that she claims triggered her due process protections. The complaint is clear that Kerr was weeks away from receiving her MAT when she notified Marshall that she would not return to her EDF 677 student-teaching assignment. Although Kerr told Marshall that she believed she had completed the student teaching requirements, Kerr's complaint does not allege that she did so. Importantly, Kerr does not allege that she had completed any of the three components of her EDF 677 grade, which included her student teaching evaluation as well as a portfolio and oral presentation. And because Kerr did not complete the requirements for EDF 677 credit (and therefore graduation and teacher certification), she did not allege that she had the

32

legitimate claim of entitlement to the due process she argues she was denied.

Regardless, Marshall provided Kerr--as a student with a grade complaint--the process she was entitled to, as outlined in the Handbook. Under the Handbook, Kerr was not entitled to abandon her student teaching and also expect to earn credit in the course. Indeed, the EDF 677 attendance policy is strict, and Kerr does not allege that her absences were excused by any of the Handbook's approved reasons. By Kerr's own admission, she received scores of "Unsatisfactory" across numerous metrics, which itself precludes credit in EDF 677. Kerr's allegations also establish that she in fact had shortcomings in the classroom: students were disengaged, refused to take her direction, and claimed they did not have to do the work she assigned. Kerr also readily admits that she left her student-teaching placement on November 19, 2013, and made it clear, unilaterally, that she would not return. Attendance and classroom instruction are both required as part of EDF 677.

To the extent that Kuhn or Southard would have been required to implement an improvement plan for Kerr if she had stayed in the program, the allegations in the complaint reveal that Kerr did not consider this to be an option. Kerr's allegations are clear that, for her, the incident with Kuhn "undermined any professional training or experience that [Kerr]

33

might further gain in defendant Kuhn's classroom" and that she considered herself to have completed the course requirements. E.R. 13. Kerr therefore did not return for the final weeks of her student-teaching assignment.

Furthermore, Kerr was given ample opportunity to challenge her grade using Marshall's internal processes. She presented her argument to five different Marshall administrators, including the Dean of Marshall's Graduate Studies. With respect to three of those five administrators--including Pittenger, the final decision-maker--the complaint does not allege that they harbor any resentment against Kerr for any reason, or even that they had interacted with Kerr outside of the appeals process. After Kerr's three appeals to Marshall, her grade of "No Credit" stood because her complaints about Kuhn, even if they were legitimate, were raised too late for Marshall to take corrective action during the Fall 2013 Semester. The multi-tiered internal appeals process was sufficient to protect Kerr's procedural due process rights, and this court should not upset the decision absent an indication that the substance of Marshall's decision was arbitrary and capricious.

The complaint, read in light of the Handbook, does not plausibly allege that the decision to award Kerr a grade of "No Credit" was arbitrary and capricious, much less that it "shock[ed] the conscience," as would be required to state a

34

claim for a violation of Kerr's substantive due process rights. Marshall had multiple rational reasons to award a grade of "No Credit" to Kerr. Kerr received "Unsatisfactory" marks on her evaluation, left her student-teaching placement early, and never requested reassignment to complete her coursework before the end of the semester. The district court therefore properly dismissed Kerr's due process claim.

5.

Kerr's § 1983 claims for a violation of her equal protection rights--against Appellees MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger--include both a sexual-orientation discrimination theory and a "class-of-one" theory. On appeal, Kerr argues that the district court "erred by creating a broad 'academic discretion' loophole in Constitutional mandates that can be invoked on 12(b)(6)." Appellant's Br. at 24. We construe Kerr's argument to be that the district court erred by (1) finding that Kerr failed to allege discriminatory intent required for her equal protection violation on a sexual orientation discrimination theory, and (2) by holding that, in an academic setting, it is not possible to state a claim for an equal protection violation under a "class of one" theory. We address each argument in turn.

i.

Kerr's first equal protection claim arises from allegations that Marshall discriminated against her on the basis of her sexual orientation. The district court dismissed this claim, holding that Kerr's complaint failed to make "specific allegations as to when or how each individual Defendant learned of [Kerr's] sexual orientation" and was "completely devoid of any allegation that Defendants' treatment of [Kerr] differed from similarly situated students." District Court Opinion at *22. On appeal, Kerr argues that she herself could represent both the person discriminated against and the similarly situated individual by alleging how she was treated before and after Appellees discovered her sexual orientation.

Although Kerr complains that Appellees Eagle, Heaton, and Pittenger violated her equal protection rights, there is no allegation of overt discriminatory animus on the part of any Appellee. Rather, the only fact alleged that relates to discrimination is that Bailey and Southard had knowledge of Kerr's sexual orientation. Based on the complaint's allegations, the district court properly dismissed Kerr's equal protection claim for intentional discrimination.

The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o State shall . . . deny to any person . . . the equal protection of the laws." U.S. Const., amend. XIV,

36

§ 1. This does not forbid states from classifying individuals at all; rather it "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). This court has noted,

> [t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

Absent knowledge of Kerr's sexual orientation, Eagle, Heaton, and Pittenger could not have intentionally discriminated against Kerr on that basis. Further, the complaint does not allege any interactions with Bailey and Southard before they learned of Kerr's sexual orientation, much less interactions that stand in contradistinction to how Appellants treated Kerr after the discovery. Although the complaint alleges that Southard and Bailey knew Kerr is homosexual, it does not allege that Bailey and Southard ever dealt with Kerr before they knew her sexual orientation: the complaint alleges that the two learned of this fact at the beginning of the Fall 2013 Semester,

37

in August 2013. Thus, Kerr's equal protection claim for intentional discrimination fails.[18]

ii.

Kerr also alleges that the decision of Appellees MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger to deny her credit for EDF 677 constituted an equal protection violation under a "class-of-one" theory. An equal protection violation can be stated under this theory if it can be shown that the government's action constituted "irrational and wholly arbitrary" discrimination of that individual. Vill. of Willowbrook v. Olech, 528 U.S. 562, 565 (2000). In other words, there must be "no rational basis for the difference in treatment." Willis v. Town of Marshall, N.C., 426 F.3d 251, 263 (4th Cir. 2005).

Kerr challenges the district court's holding that the Supreme Court's decision in Engquist v. Or. Dep't of Agric., 553 U.S. 591, 609 (2008) (holding that a "class of one" equal protection theory does not apply in the context of public employment), precludes a "class-of-one" equal protection claim in the public-education setting. See District Court Opinion

---

[18] For the same reason, we need not address the question of whether a plaintiff can represent both the similarly situated person and the person denied equal protection for purposes of stating an equal protection claim for intentional discrimination.

38

at *23-24.  As we have explained above, the complaint, read in light of the Handbook, does not plausibly allege conduct from which we could conclude Appellees lacked any rational basis for giving Kerr a grade of "No Credit" in EDF 677.  We therefore need not decide whether a "class of one" equal protection theory is possible in the public education setting and hold that the district court did not err in dismissing this claim.

6.

Finally, Kerr argues that the district court erred in finding that Kuhn was not an "employer" for purposes of Kerr's FLSA claim.  Kerr's claim is that MUBG and Kuhn violated FLSA by failing to pay Kerr the federally-mandated minimum wage for Kerr's role as a de facto substitute teacher during Kuhn's absences from the classroom.[19]  Because Kerr did not receive any payment for substitute teaching and did not ultimately earn academic credit, the complaint contends that Kuhn and MUBG violated FLSA.

In holding Kuhn was not an "employer" under FLSA, the district court noted that the complaint "utterly fail[ed] to allege any indicia of Defendant Kuhn's control over the

---

[19] The complaint contends that "Kuhn absented himself from his classroom on a regular basis without providing another supervising teacher, thus leaving Ms. Kerr responsible for his classroom duties in excess of 50% of the student teaching placement."  E.R. 28.  If Kuhn were an "employer" under FLSA, he would be liable for any unpaid wages.

conditions under which [Kerr] worked at the school, or that Defendant Kuhn held the authority to terminate her student teaching position." District Court Opinion at *26. The district court therefore granted Appellees' motion to dismiss Kerr's FLSA claim. Id. We are compelled to agree.

FLSA conditions liability on the existence of an employer-employee relationship, and the employee bears the burden of alleging and proving the existence of that relationship. Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999) (citing Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986)). FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). Employers include those with managerial responsibilities and "substantial control of the terms and conditions of the work of . . . employees." Falk v. Brennan, 414 U.S. 190, 195 (1973). To determine whether the employer-employee relationship exists, courts apply the "economic reality" test. Schultz, 466 F.3d at 304 (citing Henderson v. Inter-Chem Coal Co., 41 F.3d 567, 570 (10th Cir. 1994)).

The economic reality test focuses on "whether the worker 'is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" Id. (quoting Henderson, 41 F.3d at 570).

40

Relevant factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d. Cir. 1984)), modified by Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61 (2d Cir. 2003). Although no one factor is dispositive, not a single factor weighs in favor of finding the existence of an employer-employee relationship here.

Kuhn had no power to hire and fire Kerr. Kerr was assigned to Kuhn's classroom, and Kuhn would have had to request a reassignment--just like Kerr was required to do by the Handbook--if Kuhn wanted Kerr dismissed. Further, the complaint does not allege that Kuhn supervised and controlled Kerr's work schedule or the conditions of her employment in any way. Rather, Kuhn supervised the implementation of the course designed by Marshall under the guidelines set out by the Handbook. As Kerr was an unpaid student teacher, Kuhn could not have determined the rate and method of her payment. Finally, even though Kuhn produced Kerr's evaluation, he did not maintain her records. Instead, he reported her progress to Marshall, who kept Kerr's academic record, in line with Handbook policy.

41

The fact that Kerr did not ultimately receive course credit does not convert her truncated educational experience into unpaid labor. Given the economic reality of Kerr's position as a student teacher, the district court properly determined that Kuhn was not an "employer" under FLSA and dismissed Kerr's final claim.

III.

For the foregoing reasons, the judgment of the district court granting Appellees' motion to dismiss is

AFFIRMED.